UNITED STATES of America,

v.

Juan Carlos OSPINA and Diego
Zuluaga, Defendants.

No. CR–85–61.

United States District Court,
E.D. New York.

July 2, 1985.

On Motion to Reconsider Aug. 1, 1985.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Ephraim Savitt, Brooklyn, N.Y., for the United States.

Patten and GaNun by John Patten, New York City, Murray Cutler by Murray Cutler, Noah Lippman, of counsel, Brooklyn, N.Y., for defendants.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Defendants Juan Carlos Ospina ("Ospina") and Diego Zuluaga ("Zuluaga") move pursuant to the Fourth Amendment to the United States Constitution contending that they have been subject to illegal searches and arrests. An evidentiary hearing was held in this court from March 8 to March 19, 1985. Memoranda of law were submitted by counsel for defendants Ospina and Zuluaga on March 28 and April 1, 1985, respectively. The United States Attorney filed his memorandum of law on April 26, 1985. A reply memorandum by counsel for defendant Ospina was filed on May 7, 1985.

The defendants contend that agents assigned to New York Task Force Group 3 of the Drug Enforcement Agency ("DEA") utilized an arrest warrant to illegally enter a condominium apartment of which they were subtenants; that the information derived by the agents in the apartment was illegally obtained; that the defendants were illegally arrested; and, that the search warrant signed by Magistrate Chrein was based upon deliberate misrepresentations as well as illegally obtained evidence.

The government contends that the condominium was entered pursuant to a valid arrest warrant; that the observations made therein formed the basis for probable cause to search; that, in any event, there was consent to search; and, that the agents were acting in objective good faith reliance on a validly issued warrant based on probable cause.

## I. THE TESTIMONY

### A. The Identification of Jorge Rodriguez-Orjuelo

Special Agent Christopher Giovino ("Giovino") of the DEA was the first witness called by the government. He testified that since September 1984 his group has been holding an arrest warrant for Jorge Rodriguez-Orjuelo ("Rodriguez") on charges of conspiracy to distribute cocaine. (Tr. 7). Giovino further testified that he was present at a raid upon Rodriguez' residence located at 37th Avenue in Queens, New York at which time $350,000 in cash, a pistol, drug ledgers and other indicia of the drug trade were found. The money, Giovino noted, was found in a black steamer trunk in the master bedroom. (Tr. 8–9).

Thereafter, the agents spent "about two or three days a week of almost every week going from neighborhood to neighborhood in Queens looking for [Rodriguez]." (Tr. 9).

On January 9, 1985, Giovino was called to the Bay Club Condominium. (Tr. 10). He described the Bay Club as "two towers joined in the middle by a physical education complex," (Tr. 10), occupied by "thousands of people." (Tr. 61).

Giovino's group was advised that detectives visited the security office of the Bay Club and had made a positive identification of Rodriguez. In making the identification, the detectives used photographs seized from the 37th Avenue apartment. (Tr. 11).

Giovino, on direct examination, testified that, he too, showed photographs of Rodriguez to members of the security force. (Tr. 11). The only member of the security force to whom photographs were shown whose name Giovino remembered was Mr. Bosio. (Tr. 12, 58). Giovino could not recall the names of the security staff he spoke to, nor of the maintenance staff. (Tr. 12). Giovino does remember speaking to a lieutenant who was a black man (later

identified as Fulton). (Tr. 58). Giovino attributes his faulty memory to being "incredibly busy that day." (Tr. 64).

Giovino also testified on direct examination that these security personnel identified the person appearing in the photographs as having been "seen" in apartment penthouse-L ("PH–L"). (Tr. 12). He further testified "that they had a name for that gentlemen of Oscar Seraline ... that he was the person renting that apartment on paper, that is the name that they had." (Tr. 12–13).

Giovino "guess[ed]" that Bosio told him that "Seraline resided there with other persons, whose names the security office and the maintenance office and the rental office did not have." (Tr. 13).

On cross-examination, Giovino testified that he showed a photograph of Rodriguez to Bosio and to Fulton, (Tr. 59), and that they gave a "positive response ... to the identification of that being their Mr. Seraline." (Tr. 59). Giovino further testified to asking Bosio and Fulton, "Is that the person who lives here? If he does live here, what apartment?" The response of either Bosio or Fulton, he wasn't sure who, was " 'EPHL' or East Penthouse L." (Tr. 60).

Giovino testified that the maintenance staff, referred to as "they" in the testimony, identified the photographs as the person in PH–L. (Tr. 65). Giovino was also advised by these people that there was "a constant flow of visitors to [PH–L]; " (Tr. 14) "that the master bedroom closet door had been removed and replaced with the Medeco lock." (Tr. 14). Giovino also testified to being told that on January 10, 1985 (the next day) the maintenance staff was "to go up there and start to repair the seams in the walls." (Tr. 15).

On cross-examination, Giovino was pressed to answer the following question:

Q—You wanted to be certain, did you not, before you went into someone's apartment that you were going to be going into an apartment where Rodriguez, in fact, was? (Tr. 57)

After substantial colloquy between counsel and the court, Giovino responded:

A—In real terms I guess would be to ascertain whether or not we were going to try and enter a third party location. In fact, we were trying to find out whether or not that was the residence of our alleged Mr. Rodriguez or their Mr. Seraline. (Tr. 57).

Special Agent Michael Connors ("Connors") of the DEA was also asked about the basis of the agents knowledge that Rodriguez resided in PH–L. He testified that, "We are informed by numerous persons at that building that that was in fact the person renting the apartment." (Tr. 166). Connors was unable, however, to identify those people who made the identification other than to describe them as "persons" on the maintenance and security staffs. (Tr. 166).

Q—Officer, is it a fair statement then rather than them saying to you that this man who lives in this apartment, you came to them as a group and said to them, we believe that the person living in this apartment is this man?

A—We never approached them as a group. Initially, there were two of us who got the identification from that photograph and then we proceeded to fill out the strategy and our plans. (Tr. 166).

Connors further testified that the sole basis for his belief that Rodriguez was in PH–L was the alleged identification made by the security and maintenance staff of the Bay Club. (Tr. 169).

Under cross-examination by Zuluaga's attorney, Connors testified that the reason he arrived at the Bay Club was because two detectives with the New York City Police Department, Queens Task Force, "had information that a fugitive we were looking for named Orjuelo-Rodriguez was at the Bay Club located in Bayside, Queens and they proceeded to tell us the apartment they thought that he was in." (Tr. 173, 189).

On redirect, Connors testified that "security people" were shown a photograph of Rodriguez by detective Roy Pena and that

these security people made a positive identification of the photograph. (Tr. 198).

When asked who, in fact, had seen the fugitive at the premises, Connors responded that the Chief of Security at the Bay Club had been advised by a member of his staff that Rodriguez "had been seen there a frequent number of times," and that, "according to our information," Rodriguez resides at the Bay Club. (Tr. 176; *see also* Tr. 196–197).

Connors, at first, testified that he and Giovino confirmed the detectives identification. (Tr. 166). Later, Connors testified that detective Roy Pena was present when he spoke to the security people. (Tr. 193).

Agent William Dolinsky ("Dolinsky") of the DEA also "received information that other members of my group found out that Mr. Rodriguez was residing in a penthouse apartment at [the Bay Club]." (Tr. 236). Dolinsky testified that he had never personally seen Rodriguez, but that "Giovino indicated that [Rodriguez] may be in the apartment." (Tr. 261). Dolinsky also testified that there was a resemblance between Rodriguez and Ospina, (Tr. 262–63), but that he knew Ospina was not Rodriguez. (Tr. 266).

At the hearing, the court permitted witnesses to be heard "out of turn." Accordingly, the next two witnesses were called by the defense.

Joseph Bosio ("Bosio"), security director at the Bay Club Condominium Complex, who is a retired detective after 21 years in the police department, (Tr. 289), testified that on January 10, 1985 he had occasion to meet Giovino. Bosio further testified that Giovino, who was present in the courtroom, had not shown him any photographs but that Healy and Pena had shown him photographs. (Tr. 287). Bosio testified that he did not identify the photographs at any time. (Tr. 287–88).

Bosio implied that he had been shown photographs on two occasions. On one of those occasions Fulton was present.

Q—When [Fulton] was with you were the pictures on a table and both of you were looking at them?

A—The detective was holding the picture.

Q—But the focus of everyone's attention was to look at the pictures to see if there could be an identification made?

A—Correct.

Q—Did Lieutenant Fulton make an identification of the pictures?

A—Not in my presence while I was there to my knowledge.

Q—What did he say while you were there?

A—He had recognized one individual as being on the complex but he didn't know who he was or what his name was. (Tr. 288).

Bosio also testified that Fulton said that he (Fulton) had seen "the one individual in one of the pictures on—I don't remember the date—but it was apartment 9–L," (Tr. 279–80), which is "10 or 11 stories" from PH–L. (Tr. 280).

It was Bosio's testimony that Fulton was the only member of the security staff to speak to him about identifying photographs. Bosio did speak to maintenance workers about the photographs as well. (Tr. 290).

Bosio testified on cross-examination that based upon conversations he had with Giovino, among others, on January 10, 1985, he knew that the agents were looking for an individual of whom the agents had photographs. Moreover, Bosio testified that he "had been told" by the agents that they were trying to find Rodriguez because they had information that Rodriguez lived at the Bay Club. (Tr. 292).

On redirect examination, Bosio testified as follows:

Q—Did they tell you where they had gotten this prior information?

A—You mean the pictures?

Q—The prior information that the person they were looking for was in the Bay Club Condominium?

A—No.

Q—They indicated to you prior to January 9th they had some information the fellow lived there?

A—That's the impression they gave me but didn't tell me how they knew that. (Tr. 291).

Paul Fulton ("Fulton"), a lieutenant on the security staff of the Bay Club Condominium was called as a defense witness on March 13, 1985. Fulton was called as a government witness on March 18, 1985.

Fulton's March 13, 1985 testimony was that certain police officers came to the Bay Club on a Thursday [January 10, 1985]. "Several weeks" earlier the police officers had shown him photographs, and that the officers "mentioned they were inquiring about a certain apartment in our complex which was 9–L more specifically." (Tr. 293).

Fulton further testified that when he met the police officers several weeks earlier, he told them that he had been to apartment 9–L and when there he saw "a female occupant and a male in that unit." (Tr. 294). Fulton also testified that he had not been asked to look through the complex' visitors log regarding apartment 9–L. (Tr. 295).

Fulton testified that on January 10 he was shown a "number of photographs" by officers Pena and Healy, but none by Giovino. (Tr. 296–97). Fulton recognized one of the photographs as being someone he had seen in apartment 9–L (Tr. 297).

On cross-examination of his March 13 testimony regarding his identification of the man in 9–L, Fulton testified that he did not "right away" ascertain who lived in apartment 9–L, but he did recall that the male and female each spoke very little English. (Tr. 299).

Fulton confirmed that he identified photographs of the man in 9–L to the officers and that he had seen the man in the building some weeks earlier. (Tr. 299).

Q—Did you find out if this man was a resident in the building at this time?

A—I had no idea. I did not. (Tr. 300).

Fulton had no knowledge whether or not fellow security officers knew where the man or woman lived. (Tr. 300).

On redirect examination, Fulton stated:

Q—When you identified the photographs it wasn't this is a guy I see in the complex somewhere but apartment 9–L?

A—That's exactly what I stated.

Q—Not in the penthouse?

A—No.

On March 18, 1985 Fulton was again called to testify, this time as a government witness.

As a prosecution witness, Fulton testified that sometime prior to Christmas detectives Healy and Pena made an inquiry about apartment 9–L. (Tr. 324–25). The detectives had information that someone was residing in 9–L but "we told them that nobody was living in that apartment."

Q—Now, they didn't ask you about the east penthouse L apartment initially?

A—No.

Q—Or at any time?

A—No, they did not. (Tr. 326).

Fulton then testified that on the December date he went up to apartment 9–L with Healy and Pena. Also present were Bosio and Assistant Superintendent John Wambser ("Wambser"). (Tr. 327).

Fulton testified that Bosio, Healy, Pena and Wambser knocked on the door and that a woman answered. Fulton was unable to hear their conversation because he was in the hallway standing by the elevator banks. (Tr. 328).

After the officers spoke with the woman in 9–L, Fulton told the officers that he had occasion to go to 9–L about a week prior to their investigation. At that time Fulton observed a male and a female being present. "The male person told me that the female was the owner or the resident of ... 9–L." (Tr. 329). The man advised him that "he was a resident, okay, and he mentioned the—from the penthouse floor, okay. He didn't mention any letter or number or anything like that." (Tr. 329).

Fulton proceeded to describe to the detectives the physical characteristics of the

man: "I just told them that he was so tall, you know what I mean. He was a Latin because he spoke broken Spanish or whatever...." (Tr. 331).

Subsequent to this conversation, the detectives showed Fulton some photographs of Rodriguez, and Fulton recognized them as being the person who was in 9–L (Tr. 331–332).

At the time Fulton was being shown photographs, Wambser was also present. "[Wambser] agreed that he recognized that person as being a resident in penthouse L." (Tr. 333).

On cross-examination, the defense questioned Fulton at length regarding his prior statement that he was unable to associate the individual in the photographs and penthouse L. Fulton denied having lied during his prior testimony insisting that he "just didn't remember." (Tr. 338).

Q—Something happened between when I asked you the last time and today that prompted your memory; is that correct?
A—That's correct, sir. (Tr. 339).

Fulton, moreover, was unclear whether he was shown any photographs subsequent to the pre-Christmas December date. (Tr. 340). He was clear, however, that Giovino, who was present in the courtroom, never showed him photographs and that the "only persons [who] showed me photos were Pena and Healy." (Tr. 342).

John Wambser, the assistant superintendent at the Bay Club Condominiums, was called as a government witness. He testified that Healy and Pena were, sometime in December 1984, at the Bay Club investigating apartment 9–L.

Wambser testified that the Bay Club management had 9–L listed as a vacant apartment.

The officers seemed to believe that someone was living there. So I escorted the officers [Healy and Pena] with the security officer [Fulton] up to the apartment. We rang the doorbell a few times. Nobody answered. I went to use my pass key and a lady opened the door. (Tr. 345).

Wambser testified to having a conversation with the officers as they were leaving apartment 9–L:

A—Well, they were—we were discussing—Officer Fulton was asking the people in the apartment, the woman in the apartment, that he recalled the woman having problems with her security system. And that there was a gentleman there giving her a hand with the apartment. (Cf. Tr. 328 where Fulton testified that he was not in the apartment at this time.)

I started to talk to them about an apartment—we were kiding about an upstairs, where I—we went into the apartment and there were Spanish speaking people and they had a lock on the bedroom—closet door or something. We were kidding around. The officer asked me—(Tr. 346–47).

Wambser testified that he was referring to PH–L. Moreover, Wambser told the detectives that "we had an emergency there. We had a pipe break and we had to get into the closet and there was a lock on the closet." (Tr. 347).

Wambser then testified that he was shown photographs by the detectives and that he recognized the male depicted in two of the photographs as being "the gentleman that was in penthouse L in the bedroom at that time when we went up for the emergency." (Tr. 348).

Wambser also testified that Fulton recognized the "gentleman as being the gentleman that helped the lady in 9–L with her security alarm." (Tr. 349).

On cross-examination, Wambser testified that the person in the photographs he identified looked like a person he had seen using the public telephone. (Tr. 359). Moreover, Wambser repeated that he had told the detectives that he had seen the man in the photographs in bed in the penthouse. (Tr. 361).

Wambser also testified that he had never seen Ospina and Zuluaga before. (Tr. 366).

Following Wambser's testimony, the government called Thomas Healy ("Hea-

ly"), a detective with the New York City Police Department. It was established at the hearing that Healy was not with DEA, but that he had a "loose association" with the Group 3 agents.

Healy testified that on December 20, 1984 he was conducting a homicide investigation at the Bay Club. Healy testified that the Bay Club maintains records of the name and license plate number of those who enter the complex and that on December 10, 1984, Luis Escobar, the subject of their investigation, visited the 9–L East apartment. (Tr. 370).

Healy reviewed this information with Fulton and Bosio. They advised him that the 9–L East apartment was usually sublet by its owner, but that present records indicated it was vacant. Fulton, Healy testified, advised the detectives that "about" ten days prior to December 20, there were two hispanics in the apartment, a male and female, and the male identified himself as being from the penthouse apartment. (Tr. 372).[1]

The detectives, Healy testified, then proceeded with Bosio, Fulton and Wambser to the 9–L apartment. Fulton remained at the elevator banks, Wambser was "down the hall," and Healy, Pena and Bosio went to the apartment door.

Healy testified that Bosio engaged the woman who answered the door to 9–L in conversation. The officers requested that she produce identification. The woman stated she was from Venezuela but produced Columbian identification. The woman also produced a document evidencing her status as a tenant of the unit owner and Bosio asked her to advise the management office of her status as such. (Tr. 374). Fulton later confirmed to Healy that the woman "looked like" the woman who was in the apartment on December 10. (Tr. 393).

After the detectives left 9–L, Healy testified to having a conversation with Fulton and Wambser. Wambser, Healy testified,

overheard the detectives "talking about the penthouse L apartment." (Tr. 375).

Wambser told Healy that he had been to PH–L only a few days prior in that there was a leak and he had to go in and fix it. Healy asked Wambser what the man looked like and the description Wambser gave called to Healy's mind a federal fugitive known as Jorge Rodriguez. (Tr. 375–76).

Healy testified that he had shown photographs of Rodriguez to Fulton and Wambser. Wambser identified the photographs as being the man in PH–L. Fulton identified the photographs as being the man who was present in 9–L. (Tr. 379).

About two weeks later, in early January, Healy notified the DEA task force concerning the identification. (Tr. 379).

On cross-examination, Healy testified that he did not follow proper police procedure regarding the verification of Luis Escobar's presence at 9–L on December 10. Healy further testified on cross-examination that Fulton advised him, upon viewing the photographs, that "this was the male ... who had stated to him he lived in the penthouse apartment." (Tr. 385, cf. Tr. 379).

Q—And that this male told Fulton he was from penthouse L?

A—Pent—I don't know if it was pent— he said penthouse apartment ...

Q—How many penthouse apartments are there? ...

A—... A lot of apartments—

Q—... he didn't specifically designate any specific penthouse apartment but said penthouse?

A—I took it that he said penthouse L apartment. (Tr. 386) (cf. Bosio Tr. at 288, Fulton at Tr. 329).

Earlier, on cross-examination, Healy testified that he went to his car to get photographs of Rodriguez, and that while in the building superintendent's office, he showed the photographs to Fulton and Wambser.

---

1. It should be noted that Fulton at Tr. 328–29 testified that he did not advise the officer about the "male and female" until after the detectives visited apartment 9–L.

Q—What did [Wambser] and [Fulton] say about those two photographs?

A—They both ID'd him as the—[Wambser] ID'd him as the man that was in the apartment penthouse L East apartment the day he went in to fix the water leak.

And [Fulton] ID'd him as the male that was present at the 9–L East apartment the day the alarm went off with the female. (Tr. 379, *cf.* Tr. 385).

Healy also testified that he introduced DEA agents to the security people at the Bay Club, on January 9, 1985, but that he did not show photographs at that time. Healy then stated he couldn't recall whether he had shown Bosio photographs on January 9. (Tr. 390). Moreover, Healy had no knowledge of having shown Fulton or Bosio photographs on January 10. (Tr. 393).

Following the testimony of Healy, the government again called Giovino. Giovino testified that Healy advised him of the identification of Rodriguez on "Monday or Tuesday" of the week of January 10 (January 7 or 8). (Tr. 403).

Giovino was also asked the following: Q—Were those photographs shown to the security as well as the maintenance personnel at the Bay Club Apartments by you and fellow officers?

A—At one time or another, yes, sir.

Giovino had previously testified that he personally had shown the photographs to Bosio and Fulton. (Tr. 11, 12, 58). Bosio denied being shown photographs by Giovino. (Tr. 287). Fulton denied being shown photographs by Giovino. (Tr. 296–97; 342). In fact, both Fulton and Bosio testified that only Healy and Pena had shown them photographs. (Tr. 287, 296–97). Healy, moreover, testified that the photographs were shown by him to Fulton and Bosio in December and not in January. (Tr. 390, 393). Wambser testified that he spoke with Healy and Pena regarding the photographs, (Tr. 348), but he described his meeting with Giovino (on January 10, 1985) as follows:

The officer came to me and asked me if I had—if I was going to the apartment. I said yes. He said, would you mind if I

accompanied you to the apartment. I said I have no objection. We both went up. (Tr. 352).

Wambser was not directly asked if Giovino had ever shown him photographs.

The defense then called Richard Mercy ("Mercy"), a private investigator, who is a former lieutenant in the New York City Police Department. Mercy testified that he met Bosio on January 16, 1985 and at that time Bosio stated that he was unable to identify the photographs previously shown to him by the detectives. Fulton also told Mercy that he was unable to make an identification of any photographs that were shown to him. (Tr. 407–08).

Fulton confirmed, on direct examination by the Assistant United States Attorney, that he told Mercy that he was unable to make an identification of the photographs. (Tr. 335).

Q—And what was the purpose for your denying that?

A—Well, the purpose for me denying it because I didn't know who he was and I wasn't going to divulge any information to him.

Q—Did he ever tell you who he worked for?

A—Later on, yes.

Q—At the time that he asked you the questions?

A—Yes. He was—actually I learned that while he was speaking to my boss, Mr. Bosio. (Tr. 335).

Mercy further testified that on March 18, 1985 Bosio called Wambser and told him that a private investigator was on the premises and that the investigator would speak to him.

[Wambser] told me that he was, in fact, shown a photograph of a person by police officers.

And I asked him was he able to identify the person in the photographs.

And he told me, yes, he was.

And I said, 'What identification did you make precisely?'

And he said, I told them that this was the guy I had seen using the telephone constantly. (Tr. 410).

Wambser testified that he confirmed to Mercy making an identification of some photographs that were shown to him by the detectives. (Tr. 355–56). Moreover, Wambser testified that he told Mercy that the person in the photographs was seen using the public telephones, (Tr. 359), and that Wambser, at the time of Mercy's interview of him on or about March 18, 1985, did not say anything to Mercy about the penthouse apartment. (Tr. 359). During the week of the hearing, however, Wambser advised Mercy, immediately prior to Wambser's being called as a witness, that he identified the man in the photographs as being in PH–L. (Tr. 357).

Wambser then testified:

Q—You simply told the police he was a guy who looked like a guy who was in the bed in the penthouse, isn't that correct?

A—Did I tell who?

Q—The police—this looked like a fellow I seen lying in a bed in the penthouse apartment?

A—That's correct. (Tr. 361–62). ...

Q—And your explanation for not telling Mercy anything about penthouse L was that you didn't know who he was?

A—That's correct—I knew who he was but I didn't feel it was any of his business. (Tr. 363).

Wambser insisted that his testimony regarding the December identification of the person in the photographs as being "seen" by him in PH–L is "the truth." (Tr. 357).

### B. *The Surveillance of PH–L*

On January 9, 1985, according to Giovino's testimony, the agents surveilled PH–L "to make sure that someone was actually still living the apartment." (Tr. 61). The agents, Giovino testified, spent "many hours" trying to see lights going on and off and, in fact, that the agents did see lights going on and off. (Tr. 62). Connors testified that he went across the street to see if there was a light on in the apartment. (Tr. 176).

Healy also testified to being at the Bay Club on January 9. He told the court that he introduced the DEA agents "to the people I had spoken to [at the Bay Club]. The security people. And apparently they were trying to find out, ascertain if the subject had been—their subject had been seen." (Tr. 380).

Q—What was your function in being there on January 9, in connection with the two photographs?

A—Well, the main thing was to—we had notified them about, that we, you know, we thought we had located Jorge Rodriguez. That we had ID's from the people over there.

And I brought them over to introduce them to the security people and to show them this complex and to show them, you know, where the—their parking spots were and stuff like that. (Tr. 380).

On January 10, 1985, the agents again returned to the Bay Club. Giovino testified that the agents were present in the middle to late morning hours. "We were," he testified, "trying to establish whether or not Mr. Rodriguez was in fact in [PH–L]." (Tr. 15).

... I had already shown pictures that day of Mr. Rodriguez to make sure in my mind that we had a positive identification.

When I found out that there was maintenance work to be done in that apartment, I received permission from the security office and the maintenance office to pose as a maintenance worker, accompany one of their maintenance people and go into the apartment, help him with his work and just see if Mr. Rodriguez was indeed in that apartment. (Testimony of Giovino at Tr. 15–16).

Dolinsky testified that upon his arrival at the Bay Club he set up surveillance with Platzer on the particular parking space in the complex' garage assigned to PH–L. (Tr. 236).

Platzer also testified that he and Dolinsky set up surveillance in the parking ga-

rage on January 10. Platzer said they were observing two spots and that there was a white Toyota and a red Chevrolet located there. He further testified that on January 10, beginning around 11:00 a.m., the agents spent a number of hours observing the parking spots. (Tr. 215–216).

Dolinsky testified that he does not remember whether he made a license check from the license plates to see who owned the automobiles parked in the spots assigned to PH–L. (Tr. 248). However, he definitely did not communicate with fellow DEA agents located in the security office of the Bay Club to check the license numbers for the names of the record owners. (Tr. 249).

Platzer testified that he never checked the ownership of the automobiles with the Motor Vehicle Bureau and that he does not know if any other DEA agents did so. (Tr. 232).

### C. The First Entry Into PH–L

Giovino was advised that PH–L had been subject to extensive water damage on the wall between the master bedroom and the master bedroom closet, and that the complex' maintenance staff was going into PH–L to repair the seams in the walls. (Tr. 15). Giovino, on direct examination, testified that he received permission from the "security office and the maintenance office to pose as a maintenance worker, accompany one of their maintenance people and go into the apartment, help him with his work and *just see* if Mr. Rodriguez was indeed in that apartment." (Tr. 16). (emphasis supplied).

Giovino testified that he went to PH–L with a maintenance worker at about 11:00 a.m. He was admitted to the unit by defendant Ospina. Mr. Ospina, Giovino testified, accompanied Giovino and the maintenance worker into the master bedroom:

> ... where he showed us the bathroom and the closet.

The closet door was open at this time and the maintenance man commented to me that was the original closet door and the other closet door that was on there had disappeared with the Medeco lock. (Tr. 17).

Giovino further testified that he observed another bathroom on his left, the door was closed and the shower was on; consequently, Giovino was unable to see who was in the bathroom. Moreover, in the master bedroom, Giovino observed two men, later identified as defendant Zuluaga and Mario Gutierrez. (Tr. 17–18).

Giovino testified that he then entered the closet:

> The maintenance gentleman and I went back and forth from the closet into the bathroom as he was showing me the damage done, trying to facilitate my ruse as a maintenance worker.
>
> As you immediately walk inside the closet door there are shelves.
>
> On one of those shelves was a tannish spiral notebook that was flipped over and on the back side and on the back side were inked-in notations with large denominations of money and some initials next to them and they were added up. On the floor of the closet, on the left hand side, there was a dark black or grey metal-like portable safe with a combination lock I think. I am not sure about that.
>
> On the right-hand side of the closet a—standing up next to each other were three large dark-colored footlockers or steamer trunks.[2] (Tr. 18–19).

After a recess, the court inquired of Giovino if either Ospina or Zuluaga was the person named in the arrest warrant, that is, Rodriguez. The transcript is unclear, but the court's recollection is that Giovino testified that Rodriguez was not one of the two defendants presently before the court. Moreover, Giovino testified that he did not see Rodriguez in the apartment, nor did he request permission to enter the apartment.

---

**2.** On voir dire, Giovino testified that after he seized the notebook (presumably pursuant to the warrant that was obtained later in the day)

he did not initial the notebook, did not voucher it and did not obtain a DEA control number for it.

Ospina, Giovino told the court, permitted Giovino to enter the apartment as a maintenance man. (Tr. 24).

Giovino, on direct examination, testified that he was in the apartment for five to ten minutes during his first entry. (Tr. 26).

Q—Did you pick up any of the objects that you referred to earlier such as the notebook?

A—No sir, the only think I touched in the apartment on my initial visit were some articles of clothing so that I could climb up and hand some tools to the other workmen and the tools themselves and some pieces of sheetrock....

Q—After being in the apartment for a few minutes what did you do?

A—I excused myself. The gentleman that I was working with was going to keep working. I pretended to be going to get some other tools. I went back downstairs to the security office which is in a separate building and related what I had seen to my supervisor and the other agents. (Tr. 26).

On cross-examination, Giovino testified that he went into the apartment disguised as a maintenance worker, and that he did not identify himself as a law enforcement officer. (Tr. 73).

Moreover, Giovino testified that he never told those persons who were present in the apartment that he had an arrest warrant for Rodriguez, nor did Giovino have a search warrant to enter the apartment; and

Q—... were you in pursuit of someone who had just fled into the apartment?

A—I had no way of knowing if the gentleman just fled.

Q—Okay. You have no way of knowing if anyone fled in there?

A—That is correct.

Q—So you were not in hot pursuit of someone who may have gone in there; is that correct?

A—That is accurate. (Tr. 74–75).

On further cross-examination, Giovino testified that he entered PH–L at about 11:00 a.m., and he "saw" three individuals in the apartment and "heard" one. (Tr. 75).

Giovino determined that the three people he saw were not Rodriguez, but he thought that the man in the shower might be Rodriguez. (Tr. 76).

Q—Tell the court the reason you didn't go into the bathroom and look into the shower at the individual taking a shower?

A—I am not sure if I can tell you that. I just wouldn't do that.

Q—I am asking you to tell the court now if there was a reason you did not do it?

A—It seems to be an invasion of the person's privacy.

Q—You are telling the court that when you have an arrest warrant for a felon you felt that it was not sensitive—there was some sensitivity involved to open up the shower door and look at this person and if he was the person you were looking for you would be embarrassing him in some way? Is that what you are telling us?

A—I thought it was an unnecessary chance to embarrass someone who *may or may not be* the person I am looking for. (emphasis supplied) (Tr. 115).

Wambser testified that he was the maintenance man who accompanied Giovino to PH–L.

The officer came to me and asked me if I had—if I was going to the apartment. I said yes. He said, would you mind if I accompanied you to the apartment. I said I have no objection. We both went up. (Tr. 352).

Wambser also testified that he did not remember who answered the door to PH–L to admit him and Giovino. Wambser said that he and Giovino proceeded to the back bedroom closet and bathroom. Wambser made a list of the necessary repair items and he recalled seeing a small safe and some trunks. (Tr. 353).

Wambser testified that he and Giovino were in the apartment for "five to ten minutes." (Tr. 354). He recalled that there were "three or four" men in the

apartment, that he believed one person was in the shower, and that he did not see the person who was in the shower. (Tr. 354).

Q—When you left the apartment did you do so with agent Giovino?

A—Yes I did.

Q—Where did you go to?

A—We went to the elevator.

Q—And who did you meet at the elevator?

A—Well, my carpenter was coming up at that time.

At that time I was giving him a list of what he needed for the job itself, for the repair.

Q—And did there come a time to your knowledge when agent Giovino and the carpenter returned to [PH–L]?

A—Well, the agent asked me if I would mind if he went back into the apartment with the carpenter.

I then asked the carpenter if he would mind and the carpenter said no, and they both went back into the apartment.

Q—Did you return to [PH–L] that day?

A—No. (Tr. 354–55).

Ospina testified that he admitted workmen into the apartment to repair the bathroom and closet walls. (Tr. 471, 474). Ospina recognized Giovino as having been one of the workmen he admitted to do the repairs. (Tr. 474).

Moreover, Ospina testified that he allowed the workmen to do the repairs without watching them work. He also testified that Zuluaga and Gutierrez were in the master bedroom and that Hernando Godoy ("Godoy") was in the shower. (Tr. 475–76).

#### D. *The Second Entry*

Giovino testified that after he exited PH–L the first time he reported his findings to his supervisor and other group members. (Tr. 115).

Connors testified that he was with Giovino in the security office and that he discussed with Giovino what had happened in the apartment. (Tr. 127, 146). Connors, on cross-examination, testified that he had no idea, based on his conversation with Giovino, whether Rodriguez was in the apartment. Moreover, Connors believed that Giovino did not know whether Rodriguez was there either. (Tr. 146). Connors did know that neither of the three individuals seen by Giovino was Rodriguez. (Tr. 148). Giovino, Connors testified, was to go back up to the apartment to identify the man in the shower. (Tr. 147).

On cross-examination, Giovino testified that he re-entered PH–L about 30 minutes after he had first departed from the apartment. The time was placed at approximately 11:45 a.m. During the second entry, Giovino was able to determine that the fourth individual in PH–L was not Rodriguez. (Tr. 76).

Giovino testified that when he went to the apartment for a second time he entered alone; again he was admitted by Ospina. (Tr. 27).

Q—What was the purpose for your going to the apartment? What was the objective for going into the apartment the second time—the first time for that matter?

A—The first time was to try and find out if Mr. Rodriguez, the person we knew as Rodriguez actually was there so we could arrest him. (*Cf.* Tr. 16, 57, 74, 75 and 115).

The second time was to identify the fourth person who I could not see the first time I was there because he was in the bathroom. I had no idea how long he was going to be in the bathroom so I didn't feel the need or reason to wait there for him.

Giovino further testified that the second entry was just before lunch. Giovino spent five minutes in the apartment and was able to see all four people in the apartment.

Q—What did you do after you observed all four individuals, realized that none of them were the fugitive or was the fugitive.

A—Being that the reason for me being there was to find out if Mr. Rodriguez was there, I was satisfied that he was not there at that time so I excused my-

self again from the work area and made up an excuse to go back downstairs to tell my group. (Tr. 28–29).

### E. *The Third Entry*

Giovino testified that he went back to the security office after he left PH–L for the second time to discuss the situation with his supervisor. Thereafter, he returned to PH–L about an hour and a half later— "enough time to let the workman have his lunch break so I wouldn't have to go back in there alone at any time." (Tr. 29).

Q—What did you have with you when you returned to [PH–L]? What were you seeking to do at that point?

A—I put up a work order. We were trying to decide whether or not Mr. Rodriguez actually still lived in that apartment or Mr. Seraline, the person we were talking was Seraline Rodriguez.

We had decided to use a device of a work order and getting someone to sign for the work asking for Mr. Seraline himself to sign the work order.

I approached Mr. Ospina—

Q—The door to the apartment was opened by Mr. Ospina for the third time?

A—Yes, sir. . . .

Q—What was the substance of your conversation with Mr. Ospina the third time you arrived at the apartment?

A—I notified him that the work was just about to be completed as far as the construction went. The only thing left to do would be to clean up a little bit, do some painting which was true and that I needed a signature on the work order just to acknowledge that it was done.

I told him that it was standard practice. I asked for the gentleman who actually rented the apartment to sign the work order. He advised me that Mr. Seraline who was the person who rented the apartment was not there. I asked him when he would return so that I may have him sign it. He said the gentleman would not be back. In fact, was out of the country. He was in Columbia and he would not return.

I said 'Well, is there anyone else, a relative or another person who actually lives in the apartment who is responsible for the apartment to sign the work order?'

He advised me Mr. Seraline's nephew or brother would be back soon and that he could sign the work order. Basically, that was it. I said that I'd be back.

Oh, excuse me, he also included that he and his friends, the other people who live in the apartment including Mr. Seraline's alleged nephew or brother were going to be vacating the apartment within that month. . . . (Tr. 30–32).

Giovino testified that he actually entered the apartment for the third time, went into the bedroom to survey the work, and returned to the doorway where the above stated conversation took place. (Tr. 33).

Q—What did you do after you left the apartment at that time?

A—Returned to the security office, told the people in my group that Mr. Ospina at that time was alone; that the other gentlemen had left and the time it took me to come back. I didn't know where they went and this Mr. Ospina told me that the gentleman who rented the apartment, Mr. Seraline, would not return. . . . (Tr. 33–34).

On cross-examination, Giovino placed the time of the third entry into PH–L at about 1:00 or 1:30 p.m. (Tr. 79). He also testified that although the agents were satisfied that Rodriguez wasn't at the Bay Club, "it is standard procedure to wait for Mr. Rodriguez to return to his residence." (Tr. 97).

Connors testified that Giovino's third entry, mistakenly referred to in the testimony as the second entry, occurred at approximately 2:00 p.m. (Tr. 149).

Ospina testified that Giovino came to the apartment in the afternoon looking for Omar Seraline and that he, Ospina, told Giovino that Seraline was out of the country. Additionally, Ospina told Giovino that he and Zuluaga were going to vacate the apartment at the end of the month. (Tr. 476–77).

### F. *The Arrest of Juan Carlos Ospina*

Giovino's knowledge of the events constituting Ospina's arrest was based on direct radio communication with his supervisor, who was present in the Bay Club garage at the time it occurred. (Tr. 36). Accordingly, Giovino testified that he was not present at the time the following events took place. (Tr. 88, 93).

About thirty minutes after Giovino's third entry into PH–L, he was advised by fellow officers that in the garage space assigned to PH–L there was a white Toyota Celica GT with an expired temporary registration sticker with the name Juan Carlos Ospina on it.

> The agents who were down there who were on surveillance saw [Ospina] drive from the parking spot to the entrance of the garage, a good distance somewhere an eighth to a quarter of a mile. It's a big garage. He had to go from one level to another. He stopped at the entrance and was doing some sort of work, I was told, between his Toyota and a Corvette which was by the entrance to the garage.

> I think he was jump—starting it or something to that effect—it was at that point that I was advised Mr. Ospina was stopped by the agents in my group. (Testimony of Giovino at Tr. 35).

Giovino testified that Ospina told the agents, who identified themselves as such, that he had no identification with him but that he had it "upstairs." The agents asked Ospina if he could get some identification and Ospina said, "Certainly." (Tr. 36).

Giovino, on cross-examination, testified that he believed there were approximately "three plus several other[ ]" officers present at the time Ospina was stopped. (Tr. 94). Moreover, Giovino testified that the stop occurred approximately two hours after the last time he left the apartment. (Tr. 98, cf. Tr. 34).

Giovino conceded that Ospina's car was "seized" without a warrant therefor; (Tr. 98–99), and that such seizure took place prior to the point in time when the agents admit to having "arrested" Ospina. Moreover, it is all but conceded that at the time the automobile was "seized," there was no probable cause to arrest Ospina.[3]

Connors, on direct examination, testified that he, too, was stationed in the security office of the Bay Club; he was advised by fellow agents that Ospina was getting into his vehicle and was headed toward the exit of the parking lot. (Tr. 128).

> The other members of the Task Force were instructed to stop Mr. Ospina from leaving the garage.... Immediately, when the order was given to stop him, myself and other members went over to the parking garage, at which time they were just leaving that area to enter the elevator area of the building." (Tr. 128–129).

Connors testified that there were approximately four officers present at the initial stop and that he was not among them. (Tr. 129). Moreover, Connors described the encounter between Ospina and the agents as follows:

> The vehicle was stopped and he was asked to produce some identification and paperwork for the vehicle he was driving.

> He had nothing on him and further inspection of the vehicle revealed a temporary registration of the vehicle in the back window which had expired so the vehicle was not registered either.

> He said he had identification in the apartment when asked and he said he would go upstairs and get it and the officers accompanied him to get it and that is when I met up with him—I met them by the bank of elevators. (Tr. 130–31).

---

**3.** *See Government's Memorandum of Law in Opposition* at 18 where it is stated that the agents had received an opinion from an Assistant U.S. Attorney that there was a legally sufficient basis "to stop Ospina *and ask him questions* about his relationship" to PH–L. (emphasis supplied). Moreover, the record amply demonstrates that no indicia of criminal activity was found, at any time, in the automobile.

On cross-examination, Connors testified that he was in the security office with Giovino when he [Connors] gave the order to stop Ospina. (Tr. 142–43).

Q—What was the reason for the stop?

A—The reason being there was no one left in the apartment. The apartment was vacant—

Q—Right, and for the purpose of identifying—

A—I didn't know it was Ospina at that time—to identify him.

Q—Your sole purpose was to identify him; correct?

A—Yes.

Q—So you wanted him stopped by fellow officers to find out who he was?

A—Yes.

Q—You knew he was not this fellow [Rodriguez]?

A—That is correct.

Q—You were already told by Giovino that [Rodriguez] wasn't up there?

A—He didn't know if he was there at the time.

Q—He told you there were four people in there and he saw all four?

A—There was a fellow in the shower and we had no idea who he was. (Tr. 144–45, cf. Tr. 33–34).

Connors repeated several times that Giovino was unable to identify the person in the shower. (T. 146–48). However, during a lunch break, Connors "read the affidavit" and recalled that Giovino told him that the person in the shower was not Rodriguez. (Tr. 149).

Connors further testified that there were "four or five" agents present at the initial stop of Ospina. (Tr. 150).

Q—And then there were two [more] of you?

A—There was one of me.

Q—Just you came by yourself?

A—That first—initially, yes. (Tr. 150; cf. Tr. 129).

Connors also testified that Giovino came to the garage "later on," but that "I don't believe I saw him in the garage." (Tr. 150). Connors did not believe there were seven agents in the garage, but he did believe four agents went to the elevator with Ospina. Moreover, Connors testified that Ospina was detained "less than five minutes" from the time the command to detain was given until the time the four agents were headed to the elevator bank with Ospina. (Tr. 151).

Q—Did any of the policemen when they stopped Mr. Ospina search the Toyota?

A—I believe so, yes.

Q—How many times did they search the Toyota?

A—I cannot answer that. I don't know....

Q—What are the policemen going through Mr. Ospina's Toyota for?

A—I believe to make sure there were no weapons or anything in the front seat area. (Tr. 152).

Connors testified that the trunk was not searched in his presence. Connors was told by other agents that the front seat area was searched. (Tr. 153).

Connors repeated that Ospina did not show any identification in the garage. (Tr. 154, 157). Ospina was, Connors testified, patted down for weapons. Connors did not know if any agents took Ospina's wallet and went through it. (Tr. 155).

Q—Did anyone remove a beeper from Mr. Ospina's person?

A—Yes, sir.

Q—They did?

A—Yes, sir.

Q—Who was the one who removed the beeper?

A—It was handed to me, I believe, by Detective Platzer. (Tr. 155).

Connors testified that he did not know under what authority Ospina's beeper was taken. (Tr. 161). Moreover, Connors testified that Ospina was not free to leave. (Tr. 157, 162).

Connors also testified that he did not see, in the garage, a photocopy of Ospina's passport, nor did he see purchase papers for the automobile. He did, however, see

the automobile papers in the apartment. (Tr. 164).

Q—Who made the decision to do it the way you did it?

A—We exhausted our means and the only way we could do it was the way we did it.

Q—To get into the apartment?

A—Yes....

Q—... Are you the one who made the decision [to detain Ospina]?

A—I had a conversation with someone and a decision was made to stop him....

Q—Did you expect him to be in possession of some narcotic or weapons?

A—I didn't know who it was at the time.

Q—How long did it take you to find out?

A—Until we went up to the apartment.

Q—Just a minute. You didn't know when you saw him that he lived in the apartment?

A—I had no idea of knowing who he was. (Tr. 180–83).

On redirect, the Assistant U.S. Attorney elicited from Connors that the decision to stop Ospina was based on a conversation by Connors with the Assistant. (Tr. 195–96). Connors, on re-cross, testified that the Assistant offered no guidance as to the parameters of the stop. (Tr. 203).

Detective Platzer testified on direct examination that while surveilling the Toyota in the garage he and Dolinsky received an order to have the occupant of the Toyota identify himself.

Myself and special agent Dolinsky pulled our car—I pulled my vehicle from—my vehicle from blocking Mr. Ospina from pulling out we exited my vehicle and identified ourselves.... I had my shield in my hand and identified myself to him and asked him for a license and registration to the vehicle. (Tr. 218; with regard to "I had my shield in my hand ..." *Cf.* Tr. 232, 319 and 321 wherein Platzer states that he had a gun in his other hand).

Platzer testified that Ospina responded that he *had* his registration *with* him in the automobile. (emphasis supplied) (Tr. 218,

220, 226; cf. Giovino at Tr. 35–36, Connors at Tr. 130–31). The agents asked Ospina to step out of the car, which he did, and "Dolinsky reached into the driver's side and removed the registration to the vehicle." (Tr. 218).

Upon examining the registration to the vehicle we noticed that the vehicle was not registered at that location.

Approximately this time special agent Giovino, detective Connors, special agent Sullivan, detective Healy and Pena arrived on the scene. (Tr. 218; cf. Giovino at Tr. 88, 93; Connors at Tr. 150).

The agents continued to question Ospina as to the location of his residence. Apparently, it was the agents' desire that Ospina prove that he lived in PH–L.

We asked him if he had any papers on him that would show he lived at this address and he stated he had these papers up in his apartment and that he would take the officers up to show them the papers showing that he lived at this address. (Tr. 219).

On cross-examination, Platzer testified that he was six feet three, 195 pounds. Furthermore, he testified that Ospina was detained in the garage "maybe 15, 20 minutes." (Tr. 222, cf. Tr. 151).

Platzer reiterated that the agent's vehicle was used to block in the Toyota. The garage attendant, Platzer stated, was not in the immediate vicinity of the Toyota at this time. Furthermore, it was Platzer's testimony that five other officers—that is, a total of seven—the entire group assigned to the Bay Club that day, were present. (Tr. 221).

Q—Is it your testimony that no one searched the Toyota at that point?

A—At that point, not that I saw (Tr. 225, *cf.* Connors at Tr. 152).

Platzer denied seeing Ospina placed up against a wall. Moreover, Platzer testified, in direct contradiction to Connors' testimony, that he did not remove a beeper from Ospina, did not see any other officer remove a beeper, and that he had no knowl-

edge of a beeper being on Ospina's person in the garage. (Tr. 225).

Q—Wasn't it your function to try and get some identification to try and find out who he was?

A—Yes.

Q—Did you ask for a wallet, let's see some ID, pal?

A—He pointed to the Toyota—to a flap in the door and stated his identification and papers were there, at which point special agent Dolinsky reached over and removed the registration to the vehicle with Mr. Ospina's name on it but not registered to those—to that location we were at. (Tr. 226).

Platzer testified that Dolinsky showed him Ospina's registration. The other five officers, upon their arrival, were "standing there," but Platzer didn't see any of them searching the vehicle.

Platzer further testified that the name Ospina identified himself to be was the same name as on the registration; that Ospina said he lived in PH–L; and, that he did not remember being shown a photocopy of Ospina's passport.

Q—Do you remember taking from Mr. Ospina the keys to the Toyota?

A—That I took them?

Q—Yes.

A—No.

Q—Did you see any of your brother officers take the keys?

A—I don't know.

Q—But you know one or some of your brother officers took the keys to the Toyota?

A—I believe so. It's possible but I don't remember.

Q—Did you see any of the officers take from my client's person the keys to the apartment?

A—No.

Q—Did you see three officers escort my client to the elevator?

A—No. I was—no, I didn't. I seen people walk away with him but I didn't know where they were going.

Q—You had no idea where they were going?

A—I had an idea.

Q—They were going upstairs?

A—Yes. (Tr. 229–230).

Again, Platzer was asked how long he was in the garage with Ospina and the seven officers, Platzer replied, "Maybe ten, fifteen minutes." (Tr. 231, cf. Tr. 222).

On cross-examination by Zuluaga's attorney Platzer stated that he took no notes and filed no reports with respect to Ospina. Platzer admitted to having his gun in his hand as well as his shield at the time of the initial stop. Moreover, the license plate on the automobile was not checked with motor vehicles, nor did he write the number down. (Tr. 232–33).

Q—So that your whole participation in this activity is what you just described— you stood there, saw this man in the car, took out your gun and shield and turned him over to the other policemen, is that right?

A—That's correct. (Tr. 233).

Dolinsky testified, on direct examination, as to the circumstances of stopping Ospina. He testified that he and Platzer pulled their vehicle behind Ospina's "to block him and impede his leaving the location." The agents identified themselves and asked Ospina for his license and registration.

Ospina stepped out of his vehicle and indicated that he had his license and registration in a pouch alongside the passenger side door.

He pointed to that pouch and I indicated that was going to go in there and retrieve the identification, license and registration and whatever, and he said that will be no problem.

I retrieved the license and registration and myself and detective Platzer perused the identification and it was for a different location than that of the complex. (Tr. 238).

Dolinsky believed that the registration was in Ospina's name. (Tr. 238). The agents asked more questions of Ospina about where he lived and Ospina "emphati-

cally stated he did live there.... and he would take us up to his apartment and show us some bills made out to himself with this address on it." (Tr. 239).

Dolinsky identified three other agents (Sullivan, Connors and LaSalla) as being present at this time. (Tr. 239). However, at Tr. 240 Dolinsky said, "Connors and I believe detective LaSalla and special agent Sullivan and I believe detective Healy and Pena accompanied him upstairs [from the garage]." (Tr. 240).

On cross-examination, Dolinsky testified that the period Ospina was detained in the garage was "approximately ten minutes." (Tr. 244). Dolinsky further testified that all of the agents, except Giovino, were in the garage at the time of the stop. (Tr. 245).

Q—My client had a pouch in the car that you retrieved, right?

A—I believe it was in a pouch....

Q—In there was the license and registration?

A—Some type of identification. (*Cf.* Platzer at Tr. 218, 229; Dolinsky at Tr. 238).

Q—You testified license and registration, officer on direct. Was it the license and registration?

A—I believe I said license and registration or some type of identification.

Q—... But it showed he had some right to operate that car, correct,?

A—Correct. (Tr. 246).

Incredibly, Dolinsky testified that the identification was in "someone's name." (Tr. 246, *cf.* Tr. 238 on direct wherein the following question was asked of Dolinsky regarding the registration: Q—Was it in the name of Juan Carlos Ospina; A—I believe it was; *see also* Tr. 218, 229, 246.).

Q ... was my client free to leave after he had given you all of the identification he had—his license and registration— this is who I am. My name is Ospina and this is my car—was he free to go then?

A—Yes, he was. (*Cf.* Connors at Tr. 157).

Q—He was? Did you tell him you can go now?

A—No.

Q—Was he surrounded by several police officers?

A—I wouldn't say surrounded, no.

Q—How many cops were there?

A—Approximately five or six (Cf. Dolinsky at Tr. 239, 240, 255).

Q—Did you remove a beeper from my client's person?

A—I didn't.

Q—Did you see him have a beeper?

A—No. (Tr. 250).

Dolinsky testified that he did not put Ospina up against a wall; that he did not search the trunk of the Toyota; and that he did not remove the keys to the Toyota. Dolinsky did testify, however, that he believed detective Lasalla "may have put the Toyota back in its original location." (Tr. 251, cf. Giovino Tr. 98–99).

Dolinsky also testified that he didn't recall seeing any agents display a gun. Moreover, Dolinsky testified that the Toyota was not searched before Ospina was brought upstairs. (Tr. 252).

Q—Isn't it true that Mr. Ospina's person was searched and you removed from him—either you or your brother officers—the keys to the apartment, the keys to the car and his wallet and the beeper?

A—I don't recall seeing any beeper. I recall the defendant taking out his wallet to look for further identification and in doing so I think he removed the keys for his apartment in order to prove to us that he resided there. (Tr. 253).[4]

Again, defense counsel asked Dolinsky about the identification supplied by Ospina:

Q—And when you fellows came up to him and asked for identification, he provided it, didn't he, or told you where it was?

A—Um-hum. That's correct.

---

4. Dolinsky was the only agent to testify to seeing Ospina's wallet. (*See* Tr. 155, 226, 229.)

Q—He was cooperating with you, right?

A—Yes.

Q—After he did that did you say to him, okay, Ospina, you can go?

A—No, I didn't.

Q—Did you ever convey to him that he was free to leave?

A—Did we come out and say you are free to leave or something like that?

Q—Yes.

A—No, we didn't. (Tr. 257–58).

On cross-examination by Zuluaga's attorney, Dolinsky was asked whether he returned to Ospina his license and Dolinsky replied, "I don't know if I held it and turned it over to my supervisor for his perusal or gave it back to Mr. Ospina." (Tr. 265).

Q—But you took it out of the car.

A—Yes. (Tr. 265).

Ralph Bedard ("Bedard") was called as a defense witness regarding the events which occurred in the Bay Club garage at the time Ospina was stopped. Bedard is a parking lot attendant at the Bay Club who was at work in the garage on January 10, 1984.

Bedard testified that he was assisting Ospina in the jump start of a black Corvette with Ospina's Toyota in the mid-afternoon of January 10. Bedard further testified that his booth was approximately 25 to 30 feet away from where the automobiles were located. (Tr. 279–81).

Bedard testified that "a couple of guys" approached Ospina and began talking to him. "One of them pulled out a wallet and the other one went around the car and just talked to him. Then they got him out of the car." (Tr. 280–81). Bedard further testified that there were a total of nine people who arrived at the scene with Ospina.

Q—Where was Mr. Ospina when all of these people were standing there?

A—He was standing next to a pole, like a cement pole.

Q—Up against the pole?

A—Yes, he was up against the pole and everybody was talking.

Q—While he was standing up against the pole what were the other officers doing, could you see them?

A—Yes.

Q—What were they doing?

A—There was two other ones looking through the [Toyota].

Q—When you say looking through the [Toyota], tell his Honor what you saw them do.

A—The car was running. They cut it off, took the keys, opened the trunk, looked in there, looked in the back seat and in the front—looked all through the car.

Q—How many times did you see them going through the car and the trunk looking through it?

Q—Twice.

Q—Two times, is that correct?

A—Two times, right.

Q—Did you have an occasion to see them placing any papers on top of the Toyota?

A—A lot of different papers.

Q—Can you tell the Judge what you saw at that point—what were they doing that you could see?

A—They was looking through a lot of papers. I couldn't tell what kind of papers. They put—they took the papers, put them on top of the car and were talking about the papers. (Tr. 281–83).

Bedard testified that Ospina was detained in the garage for "about twenty [minutes to a] half hour." (Tr. 283). Moreover, he testified to seeing four agents lead Ospina to the elevator banks. The remaining officers, prior to 3:00 p.m., Bedard testified, "took the [Toyota] downstairs." (Tr. 284–85).

The government did not cross-examine Bedard.

Detective Healy was not questioned on direct examination regarding the events in the Bay Club garage on January 10. Healy, was however, queried on cross-examination with respect to those events.

Healy testified that when he arrived in the garage, with his partner Pena, there

were two officers speaking with Ospina, and there were two others "standing over aways." (Tr. 394).

Healy denied searching the car and also denied taking a beeper from Ospina. Moreover, he testified that "nobody" searched the car. (Tr. 394–95).

Healy testified that he was in the basement with Ospina "maybe five to eight minutes." (Tr. 395).

Defendant Ospina was called by the defense to relate his version of the circumstances surrounding the stop made by the DEA agents in the Bay Club garage. Ospina testified that he was jump-starting a black Corvette with his white Toyota when a DEA agent approached him, identified himself, and asked him to get out of the car. (Tr. 451).

Ospina further testified that as he was stepping out of the car he saw the agent's gun. He spoke with the agent and then approximately eight or nine people were standing around him. The agents asked Ospina if the Corvette was stolen and Ospina replied it was not. Moreover, Ospina testified that he showed papers to the agents which identified the Corvette as a friend's automobile and the Toyota as his own. (Tr. 451–52).

The agents, Ospina testified, "turn[ed] off the ignition key of the two cars." (Tr. 452).

Q—What happened to the keys.

A—They took the keys.

The agents then searched Ospina; they reached into Ospina's pocket and took his beeper out. Ospina was asked the telephone number to the beeper which he supplied. (Tr. 452–53).

Ospina testified that he presented a photocopy of his passport to the agents. Ospina further testified that the agents took his wallet from him and searched it. Inside the wallet was Ospina's social security card and a racquet ball club card (addressed at the Bay Club); additionally, inside the automobile was a license and registration for the Toyota which the officers removed and examined. (Tr. 454–55).

Moreover, Ospina testified that four or five officers had him next to a pillar while the other agents twice searched the Toyota by opening the trunk and looking around the inside of the car. (Tr. 455–56).

It was Ospina's testimony that detective Healy was the officer who took Ospina's beeper as well as his wallet. Ospina wasn't clear who took his car keys and his apartment key. Moreover, he testified that he was in the garage with the agents for approximately a half hour. (Tr. 457).

On cross-examination Ospina testified that the registration was in his own name and that he had signed it. The agents asked Ospina if he had any guns; however, Ospina testified that "They already searched the car when they started asking me about guns." (Tr. 481).

Ospina denied telling the agents that he had identification inside PH–L. (Tr. 482), claiming instead that the agents "took me up." (Tr. 482).

### G. The "Consent" Search

Connors and Giovino, who were not present at the instant the stop occurred, testified that Ospina was wholly unable to provide any identification in the Bay Club garage; Platzer and Dolinsky, who were present, testified that Ospina produced a license and registration in the garage. They all testified that Ospina advised the agents that he had other identification that was upstairs in PH–L.

The agents asked [Ospina] if he could get his identification. He said, 'Certainly.' They accompanied him up to the apartment. They got to the door. Mr. Ospina went inside. The agents asked if they could accompany him. He said, 'Yes.' At that time the agents asked if they could look around the apartment. Mr. Ospina said, 'Yes.' (Testimony of Giovino at Tr. 36).

Giovino testified that he arrived at PH–L from the security office after being advised that Ospina had been stopped by Connors and the supervisor, Sullivan. Giovino recalled that Ospina was in the living room

with Connors. Giovino went into the master bedroom, the other agents were conducting a "sweep" search. Giovino testified that no drawers were opened and that the notebooks in the bedroom closet were not opened. However, Giovino was then advised by Connors that Ospina consented to a search of the apartment. Accordingly, Giovino picked up the notebook and secured the packet of cocaine found on a windowsill. (Tr. 36–38).

Thereafter, Giovino testified, Connors proferred to Ospina a consent form. Upon reading the form, Ospina became aware of his rights and withdrew his consent to search the apartment. (Tr. 38).

THE COURT—This is when you say he invited you in, the fourth time you went in? Did you get a consent to go in?

A—The agents were already inside the apartment.

THE COURT—They were already in there?

A—Yes.

THE COURT—You say they received the consent to go in?

A—Yes.

THE COURT—They identified themselves?

A—All the way, from the time it took to get—it's a long walk from the garage up to that apartment? (Tr. 39–40).

After Ospina withdrew his consent to search, he was "arrested" and advised of his Miranda rights. (Tr. 41). Agents were dispatched to obtain a search warrant.

Giovino testified that the remaining agents waited about two and a half hours from 3:30 p.m. for word that a warrant had been obtained. The agents watched television and had dinner with Ospina in PH–L. Ospina was asked various pedigree questions during this time and he responded that he was an illegal alien. (Tr. 41–43).

On cross-examination, Giovino testified that Connors handled the written consent to search form. Moreover, he testified that he was not present at the time the alleged consent was given in the garage. (Tr. 93–94, 100).

Connors met the agents and Ospina at the elevator bank in the garage. Connors testified that Ospina led the agents down a long corridor to PH–L. When the parties reached PH–L, Ospina "took out a key and he said he would get us identification. We said, 'We will come in with you,' and he said, 'fine.' We entered." (Tr. 131).

Connors testified that Ospina walked through the living room of PH–L into a small bedroom; Ospina "came out with paperwork but I didn't examine it." (Tr. 131–32).

An agent, Connors testified, followed Ospina into the bedroom. Apparently, after producing identification, Ospina was asked if the agents could look around the apartment, to which he replied, "Yes." (Tr. 132).

Q—What happened after that point?

A—A few officers went into the master bedroom area of the apartment.

At the same time I had a consent search form for the apartment.

I asked Mr. Ospina—I had both English and Spanish—and I asked if he needed the Spanish one and he said, no, he read and spoke English very well.

I showed him the English consent form which he read.

He had a question or two about some of the items in it. (Tr. 132–33).

Connors testified that the consent search form was provided to Ospina "within minutes" after Ospina was asked if the agents could "look around." (Tr. 133).

When Ospina read the consent form his attention was called to those items relative to his right to an attorney and his right to withdraw consent. Ospina asked Connors, "What [does] that mean and I said exactly what it said." (Tr. 134).

Ospina withdrew his consent and was promptly arrested. The team was advised to stop searching. (Tr. 134).

Prior to discontinuing the search the agents "went and saw the ledgers in the master bedroom closet and they also saw the white powder in the clear plastic bag on the window sill." (Tr. 134).

At this time agents Kirk and Dolinsky proceeded to the courthouse and the remaining agents waited in the apartment with Ospina. (Tr. 136–37).

On cross-examination, Connors explicitly testified that Ospina was told, "We are coming in with you," when the agents arrived from the garage with Ospina at PH–L. At the time the statement was made Ospina was surrounded by four agents. (Tr. 157).

Connors also testified that he did not proffer the consent form to Ospina prior to entering PH–L. Instead, he simply announced, "We are coming in with you." (Tr. 160).

It was Connors testimony that Ospina "opened the door to his apartment." (Tr. 162). Three agents entered the apartment, Connors among them. Apparently, other agents contemporaneously arrived as Connors was no longer clear as to how many were there. (Tr. 163).

Minutes after getting inside the apartment Connors proferred the consent form to Ospina.

Q—So it would have been just as easy for you to show him the consent form before you went in as after, is that correct?

A—It was my option, I'd say, because once we got the verbal consent that's when I asked him if he wanted to read it for the written consent.

Q—But the verbal consent is when you asked to him—not by way of a question but by way of a statement—"We are coming in with you?"

A—Yes—for our own personal safety.

Q—You say that is his own voluntary response to oral request to search his apartment?

A—No. Once inside we asked if we could look.

Q—That is after supposedly having an officer going with him into the bedroom?

A—They waited outside the doorway and waited for him to go in and they got some sort of identification.

Q—Did you ask the man's permission to enter the apartment in the first instance—yes or no?

A—No, sir. (Tr. 164–65).

It was also Connors' testimony that he had "no idea" that he was going to gain entry to PH–L by stopping Ospina. Moreover, Connors knew that Ospina had come from an automobile parked in a spot assigned to PH–L, and he knew that when he was in the elevator on the way to PH–L, discussing with Ospina his occupancy thereof, that he was going to gain entrance to PH–L. (Tr. 186–87).

Furthermore, Connors testified that, while on the elevator, Ospina had "the key [to PH–L] on him." (Tr. 187).

Q—If he wanted to get off at a different stop, you would have stopped him?

A—Yes sir.

Q—So, there is no question but at that time he was under detention?

A—We wanted a proper identification—

Q—I didn't ask you why. There was no alarm on the [Toyota] and there was no question that it was [not] stolen.

A—No question.

Platzer testified that he remained in the garage after the agents escorted Ospina to PH–L, and shortly thereafter Platzer received a call from Giovino to proceed upstairs. Whereupon, Giovino discussed the search warrant application with Platzer's partner, Dolinsky. (Tr. 220).

Dolinsky testified that Ospina was accompanied to PH–L by detectives Connors, La Salla, Healy and Pena, and special agent Sullivan. (Tr. 240).

Shortly thereafter, Dolinsky and Platzer were called up to PH–L. When Dolinsky and Platzer arrived, Giovino approached Dolinsky to discuss probable cause to get a search warrant for PH–L. (Tr. 241).

It was Ospina's testimony that he fully cooperated with the agents demands. Moreover, he testified that after he told the agents he lived in PH–L the agents said, "let's go upstairs." Ospina and the agents proceeded to PH–L. When they arrived at

the apartment Healy handed Ospina the apartment key and said, "Open up."

Ospina testified that the agents entered with him saying, "We going in with you."

Q—Then what happened?

A—We got in. We stayed there in the living room. And then these two guys went in the, in my apartment. They was looking around. Then I said, what's the matter. What's happening? Can I see? Then they say, no, go back. Stay in the living room.

I stayed in the living room. Then pass about a half hour. They was looking. Then this Connors, Detective Connors, he said, sign here....

Q—Did he say, here, read this. I want you to read this and after you read it, I want you to sign this?

A—He pass me [the consent form]. I say, I'll read it first. Then I start reading....

Q—Did you read it?

A—Then I read it ...

Q—Then what happened? Did you sign it?

A—No. Then I read and I said I am not going to sign this. I want to see my lawyer.

Q—... how many officers were up in the apartment at that time?

A—... four....

Q—... Did you ever invite them. into your apartment?

A—No.

Q—Did you ever give consent to them to come into your apartment?

A—No.

Q—The first time you ever heard anything about a consent was when he showed you the form; isn't that right?

A—Yes. (Tr. 458–460).

It was also Ospina's testimony that following his refusal to sign the consent form, there were ten officers present in PH–L. (Tr. 460).

On cross-examination, it was Ospina's testimony that the agents took him up to PH–L; that the agents said, "We are going in," and about fifteen minutes later (cf. Tr.

458) he was shown the consent form. (Tr. 485).

Moreover, Ospina testified that when advised of his right to halt the search and to counsel it was immediately exercised. (Tr. 487).

### H. *Dylan the Dog*

Apparently, a dog, named Dylan, trained to "sniff-out" narcotics was brought to the Bay Club on January 10. Giovino testified that the dog was brought to the Bay Club "later" in the day. (Tr. 68, 78). Giovino believed that the dog was brought to the scene after the application for a search warrant was made, that is, approximately 3:30 p.m. (Tr. 79). Dylan arrived, Giovino testified, at approximately 5:00 p.m. (Tr. 79).

Giovino further testified that Dylan's purpose is to search. (Tr. 87).

Q—Did Dylan, if you know, search [Ospina's] car down in the garage?

A—No.

Q—Did he ever?

A—Eventually he did.

Q—What time do you say he searched the car?

A—I think it was much later in the afternoon. I don't recall if it was six or seven o'clock.

Q—He didn't arrive until seven o'clock?

A—We kept the dog and his handler away from the scene until we had the search warrant.

Q—Did you have a warrant to put the dog down in the garage and search Mr. Ospina down in the garage or for the apartment?

A—It was for the home.

Q—Did he, the dog, search the car?

A—Yes.

Q—Under what authority?

A—We seized the car. (Tr. 98–99).

### I. *"We've been doing our homework on you Juan Carlos"*

On cross-examination, Giovino testified to being present in PH–L continuously

from approximately 3:30 p.m. (Tr. 79) until about 9:00 p.m. when he transported Ospina to the DEA office as well as the Metropolitan Correctional Center. (Tr. 124). It is also well established that the agents arrived at the Bay Club at about 11:00 a.m. Additionally, Giovino testified that the search warrant was signed at about 6:20 p.m. (Tr. 122).

Accordingly, the following testimony with reference to the period of time Giovino was in PH–L with Ospina awaiting word that a search warrant had been signed is inconsistent with Giovino's statements that his entries into PH–L were strictly limited to observations of the apartment and its occupants. Neither is the testimony consistent with Giovino's statement that the one and one-half hour interval between the second and third entries into PH–L was designed to provide "enough time to let the workman have his lunch break" (Tr. 29), nor is it consistent with Giovinos statements that he remained in the security office with Connors after the third entry.

Q—Did you say to Mr. Ospina, Juan, we have been doing our homework on you and we know you traded in a gold Corolla for $3,000 and paid $7,000 for the Toyota. Were you there when that was said?

A—No sir.

Q—Did you say it to him?

A—I don't think so.

Q—Is this the first you are ever hearing of that?

A—No, not at all.

Q—Isn't it a fact, sir, that prior to ever going to the condominium at Bay Terrace either you or members of your group went to a Toyota dealership on Northern Boulevard in Queens and inquired into the Toyota?

A—That is absolutely false.

Q—Absolutely false. Did you tell the people at the Toyota dealership, you are going to get a subpoena and find out who has been buying cars for cash?

A—Those words are not correct.
(colloquy)

Q—So officer, to repeat my question, were you present and did you hear Detective Connors say to Mr. Ospina, Juan, we have been doing our homework on you? We know you had a gold Corolla that you traded in for $3,000 and you paid for the white Toyota, $7,000 cash. Were you present when that happened?

A—I don't remember hearing that.

Q—It's not that it was never said but you don't remember hearing it?

A—I don't remember saying that to members of my group. If you like I can go into that.

Q—That is fine.

A—And I was at that Toyota dealership at one time and I asked questions but not about this case.

Q—Let's find out when you were at the Toyota dealership.

A—Probably two months before that.

Q—What brought you there?

A—A totally separate case. We seized a Toyota from another defendant and we questioned the dealer about that car.

Q—And it is pure coincidence—was that fellow Columbian?

A—Yes.

Q—And involved in drugs?

A—Of course.

Q—And it is pure coincidence that you went to the same Toyota dealership where this gentleman purchased the vehicle?

A—No. In fact—we were drawn back to that dealership *on the day we arrested Mr. Ospina* because *found in the apartment* was a dealer's envelope saying Queensboro Toyota, and I, being a semi-intelligent human being, went to the dealership. (emphasis supplied). (Tr. 89–93).

If Giovino is telling the truth, the envelope had to have been examined, without a warrant or probable cause, prior to the time Ospina was detained in the garage. Moreover, Giovino would have had to have gone to the dealership during the repair-

man's lunch break—prior to the third entry. Accordingly, the agents must have known who Ospina was prior to their detaining him in the garage. (*See, e.g.,* Tr. 92–93, 121, 144, 157, 164, 186, 401–403).

Connors was also questioned regarding his conversations with Ospina while awaiting the search warrant.

Q—Did you have the occasion to tell Mr. Ospina that you had done your homework on him and that you knew he traded in a gold Corolla for $3,000 and purchased a Toyota with cash?

A—No, sir, I didn't have that conversation.

Q—Were you present when someone else said it to my client?

A—No, sir.

Q—According to you it was never said.

A—I heard about it later on but I didn't know about it at that time.

Q—Later on being what time?

A—I don't recall the exact time I had a conversation with Agent Giovino.

Q—Since he was on the witness stand and cross-examined; is that right?

A—No, sir.

Q—Well, what about the conversation with Mr. Ospina about the gold Corolla. Ever hear about that before?

A—I never had that conversation. (Tr. 167).

Ospina took the stand and testified to the conversation as follows:

Q—Did you have a conversation or did Detective Connors say something to you about your—about the Toyota?

A—Oh, yes. He said, when—that was about 6:00 something like that. Then he said, don't think we came here by coincidence. We been doing some homework on you, Juan Carlos. We know you traded this gold Corolla Toyota to the Toyota in—for the white Toyota.

Q—Traded in the gold Corolla for a white Toyota Celica?

A—Celica.

Q—I see. Now did you previous to that day trade in a gold Corolla?

A—Yes.

Q—For a white Celica?

A—They even gave me the prices.

Q—They even gave you the prices?

A—The agents.

Q—When you heard that, did it ring a bell in your mind, that that was true?

A—Of course. (Tr. 461).

### J. *The Search Warrant*

After Ospina was brought up to PH–L and the "sweep" search completed, Dolinsky proceeded to the Eastern District Courthouse for the purpose of obtaining a warrant to search PH–L. Dolinsky, "primarily on discussions with … Giovino" swore out the affidavit in support of the warrant application.

The salient "facts" contained in the warrant application are as follows:

1. The agents had an arrest warrant for Rodriguez;

2. "Security personnel" of the Bay Club positively identified photographs of Rodriguez as a resident of PH–L for "about three months." Moreover, Rodriguez had disappeared about three months prior to the application.

3. Giovino entered PH–L disguised as a maintenance man to "determine whether" Rodriguez was in PHL "at that time."

4. Giovino saw three hispanic males; a fourth was in the shower. Giovino, along with maintenance personnel, went to the master bedroom where water damage had occurred. Inside the bedroom closet, of which the door was open, was, "in plain view," three black footlockers and a safe. On a shelf in the closet was a spiral bound tan covered notebook and a black bound notebook. Giovino exited from PH–L.

5. Giovino returned to the apartment. The person in the shower was identified Juan Carlos Seraline. Giovino asked one of the hispanics when " 'Oscar Seraline,' (the apparent alias of RODRIGUEZ–ORJUELO) was returning since the lessee" had to sign a work order. The unamed Hispanic said " 'Oscar' " was out of the country and would not return. Moreover, the Hispanic

said that the current occupants would be moving soon. "The Hispanic male advised the agent that 'Oscar's brother, referring to Juan Carlos Seraline, was authorized to sign the 'work order' for 'Oscar.'"

6. Three months prior, Rodriguez' apartment also contained footlockers from which over $343,000 in cash was recovered. The proximity of the notebooks to the footlockers and safe in PH–L was similar to such items found in Rodriguez' apartment.

7. After learning Rodriguez was not at PH–L, "Juan Carlos Seraline" was observed entering the garage of the Bay Club. "Juan Carlos Seraline was stopped by Task Force officers who identified themselves and asked him for identification and for consent to enter and search [PH–L]. Juan Carlos Seraline, who spoke and understood English, consented orally and led the officers and agents to the [PH–L]." The agents entered PH–L to insure their safety, conducted a "sweep" search, and discovered a small quantity of white powder on a windowsill.

8. After the "sweep" search, a consent form was proferred to "Juan Carlos Seraline." Seraline withdrew "his earlier consent to search."

9. "No search of the subject premises has been performed other than the 'sweep' search." The warrant itself provided for a search of PH–L, namely, indicia of narcotics and related transactions "found in three black steamer trunks and a dark grey floor safe inside the subject premises as well as in other areas of the subject premises."

The government concedes that "nothing of an evidentiary nature was recovered from the footlockers or the floor safe ..." (Government's Memorandum of Law in Opposition to the Defendants' Motion to Suppress at 26). However, a substantial quantity of drugs and other narcotics related items were found elsewhere in PH–L. (*See* Giovino at 44–47).

Giovino testified, on cross-examination, that all those persons who were in the apartment during his first and second entries were depicted in photographs found in the apartment, but that Rodriguez appeared in no photographs found at PH–L. (Tr. 95).

Moreover, Giovino testified that Dolinsky was mistaken when Dolinsky said in his affidavit that "Juan Carlos Seraline" was the man in the shower. Giovino testified that he believed that Ospina was Juan Carlos Seraline, the man who opened the door each time Giovino came to PH–L. (Tr. 121–22).

Dolinsky testified that everything in the warrant affidavit, other than his activity concerning the detention of Ospina in the garage, was based on information provided by Giovino. (Tr. 269).

### K. *The Arrest of Zuluaga*

Giovino testified that he departed from PH–L at about 9:00 p.m. and that other officers remained there. Giovino testified that the agents' objective was "to wait for Mr. Rodriguez" and to arrest the other persons in the apartment and identify them fully. (Tr. 125).

Connors testified that he remained in PH–L "to see if in fact Jorge Rodriguez returned or anyone else returned to the apartment. We wanted to identify them." (Tr. 138).

Connors testified that photographs were recovered in the apartment and that Giovino had identified them as being the people he had seen there earlier in the day. (Tr. 138–39).

About 11:00 p.m. Zuluaga, Godoy, Guttierez and Garza entered the apartment and were stopped by the agents who remained inside the apartment to be patted down. (Tr. 139).

From Zuluaga's person a communications beeper was recovered as well as a miniature notebook from which Connors concluded that Zuluaga was in the drug trafficking business. (Tr. 141). Accordingly, Connors placed Zuluaga under arrest.

## II. FINDINGS OF FACT

### A. *The Identification of Jorge Rodriguez Orjeulo*

1. Detectives Healy and Pena, who were neither DEA agents nor assigned to Task Force Group 3, were at the Bay Club Condominium complex on December 20, 1984 pursuant to an investigation unrelated to this case.

2. In the course of Healy and Pena's investigation at the Bay Club, on December 20, the detectives received information that led them to believe that Rodriguez was seen at the Bay Club.

3. Wambser, a member of the Bay Club's maintenance staff, told the detectives that he had seen Rodriguez a few days earlier in bed in Apartment PH–L. Moreover, Wambser told the detectives that he had seen Rodriguez using the public telephone in the Bay Club.

4. Fulton, a member of the Bay Club's security staff, told the detectives that he had seen Rodriguez in Apartment 9–L about ten days prior to December 20. Moreover, Fulton made no statement relating Rodriguez to PH–L.

5. No personnel of the Bay Club identified the photographs of Jorge Rodriguez Orjeulo as being a tenant of the Bay Club for any period of time. No personnel of the Bay Club stated that Rodriguez was "renting" PH–L in the name of Oscar Seraline. No personnel of the Bay Club identified the photograph of Rodriguez as being an individual they knew to be Oscar Seraline.

6. Bosio was shown photographs of Rodriguez by Healy and Pena, but was unable to identify the photographs. Moreover, Bosio made no statement to the detectives regarding the occupants of PH–L. In fact, Bosio's testimony is that he was "told" by the agents that Rodriguez lived at the Bay Club.

7. Agents of DEA Task Force 3 arrived at the Bay Club on January 9 and 10, 1985 pursuant to the information provided to them by Healy and Pena. Agents observed lights going on and off in PH–L. More-over, neither Bosio nor Fulton were shown photographs by anyone on either January 9 or January 10, 1985.

8. No member of the security or maintenance staff advised the agents that there was a "constant flow of visitors" to PH–L.

9. The DEA Task Force, at the Bay Club, on January 9 and January 10, 1985 was investigating Rodriguez' presence at a "third party location."

10. Neither Bosio nor Fulton were shown photographs of Rodriguez by Giovino.

11. PH–L was not the residence of Rodriguez.

12. PH–L was the residence of Ospina and Zuluaga.

### B. *Surveillance of PH–L and The First Entry*

1. No effort was made to ascertain the presence of Rodriguez in PH–L on either January 9 or January 10, 1985. The agents merely sought to determine whether "someone" was in the apartment.

2. Ospina opened the apartment door to permit the Bay Club maintenance staff to do repair work. DEA agent Giovino entered PH–L posing as a member of the Bay Club's maintenance staff.

3. Giovino never sought consent, as a DEA agent, to enter PH–L.

4. Giovino was not in "hot pursuit" of anyone when he entered the apartment; nor were there exigent circumstances necessitating an immediate entry to PH–L.

5. Giovino observed three Hispanic males, none of whom were Rodriguez, in the apartment. A fourth person, not identified, was in a bathroom taking a shower.

6. Maintenance personnel were in the apartment to repair water damage. In the closet near the area of water damage were two notebooks, a safe and three steamer trunks.

7. Giovino was present in PH–L for approximately five to ten minutes.

### C. *The Second Entry*

1. Again, Ospina admitted Giovino to PH–L. Ospina believed that Giovino was a maintenance worker.

2. Prior to the second entry, Giovino advised his fellow agents that Rodriguez had not been seen in PH–L. Subsequent to the second entry, Giovino advised his fellow agents that Rodriguez was not present in PH–L.

### D. *The Third Entry*

1. Ospina admitted Giovino to PH–L for the purpose of discussing a work order to be signed by a resident of PH–L.

2. The work order went unsigned. Ospina advised Giovino that Seraline was in South America. Moreover, Ospina indicated to Giovino that he, Zuluaga, Godoy and Gutierrez were the current occupants of the apartment and that they would be moving out at the end of the month.

3. Giovino observed that Ospina was the only person present in PH–L at this time. Moreover, he advised his fellow agents that the apartment was empty but for Ospina.

### E. *The Arrest of Juan Carlos Ospina*

1. Ospina entered a white Toyota Celica parked in a space assigned to PH–L and drove it to a point near the garage exit. Ospina, with some assistance from Bedard, was jump-starting a Corvette. Ospina was seated in the Toyota at the time he was approached by two agents.

2. At the time the two agents approached Ospina, the agents were aware that Ospina was the last person present in PH–L.

3. Ospina's Toyota was "blocked" by the vehicle driven by DEA agents Platzer and Dolinsky.

4. Platzer approached Ospina, who was sitting in the Toyota, at the driver's side window, with a gun in one hand and a shield in the other. Dolinsky approached the Toyota from the opposite side.

5. Ospina was ordered to exit the Toyota. At the time Ospina complied, there were at least seven DEA agents and/or police officers in the immediate vicinity of Ospina.

6. Ospina complied with the agents' request that he identify himself. Ospina directed the agents' attention to a pouch in the automobile which contained his driver's license and registration. The license and registration were removed from the Toyota and examined.

7. The agents seized the keys to the automobile and proceeded to search its interior as well as its trunk.

8. The agents seized a telephone beeper from Ospina and demanded to know its telephone number, which number Ospina provided.

9. The agents also examined the contents of Ospina's wallet and found therein, among other things, a card authorizing Ospina's use of the Bay Club's athletic facilities.

10. The agents were unsatisfied with Ospina's license and registration which were addressed to a location other than the Bay Club. Ospina had stated that he lived at the Bay Club. Accordingly, the agents demanded additional "proof" that Ospina lived at the Bay Club. To such demands, Ospina responded that he had bills and receipts in PH–L evidencing his occupancy thereof.

11. Upon Ospina's statement that he had further information in the apartment, one of the agents said, "Let's go."

12. Ospina was detained in the garage for at least twenty minutes.

13. Ospina was not advised of his rights while being detained in the garage.

14. Ospina was not asked for consent to enter PH–L while in the garage.

15. As Ospina was being escorted to the elevator to proceed to PH–L the white Toyota Celica was "seized" and moved to a different location.

### F. *"Consent" Search*

1. Ospina was not asked for consent to enter PH–L, nor advised of his right to refuse same, during the elevator ride to PH–L.

2. Ospina was escorted to PH–L by five agents.

3. At the apartment door, Ospina was told, "Open up," and "We are coming in with you." Ospina was not asked if he consented to the agents' entry therein.

4. Upon entering the apartment, Ospina was advised to remain in the living room while a "sweep" search was undertaken.

5. During the "sweep" search Giovino arrived in the apartment and pointed out to fellow agents the two notebooks, safe, and footlockers in the bedroom closet. Moreover, a small packet containing cocaine was found in the other bedroom.

6. After the "sweep" search had begun and after being in the apartment for about five minutes, Ospina was asked for consent to search. At this time a consent form was proffered to Ospina. Ospina refused consent to search.

### G. *Search Warrant*

1. Security personnel of the Bay Club did not positively identify Rodriguez as being a resident of PH–L for three months.

2. Wambser, a member of the maintenance staff identified Rodriguez as being seen in bed on one occasion at least four weeks prior to the application for a search warrant.

3. The agents made no efforts to corroborate Wambser's identification and statements.

4. Rodriguez was not present at PH–L.

5. Ospina never portrayed himself to be Juan Carlos Seraline; that is, "Oscar's" brother.

6. There were three black footlockers, a safe and two notebooks in the water-damaged closet.

7. Task Force Officers did not disclose to the Magistrate that Ospina was arrested in the Bay Club garage.

8. Task Force Officers did not disclose to the Magistrate that consent to search or enter PH–L was not sought.

9. Ospina was not asked to consent to an entry of PH–L nor of a search. Accordingly, Ospina did not consent to either.

10. Ospina was not provided with the consent form until after he was arrested and after the search of PH–L had already begun.

### H. *Arrest of Zuluaga*

1. The agents remained in PH–L for two hours after the warrant had been executed.

2. A beeper was seized from Zuluaga.

3. During a "pat down" of Zuluaga, a pad measuring two inches wide, four inches high and one-eighth inches thick was seized from Zuluaga and the contents thereof examined.

### III. CONCLUSIONS OF LAW

### A. *Initial Entry*

On December 20, 1984, New York City Police Department detectives Healy and Pena received information from Wambser, a member of the Bay Club maintenance staff, that a person known to the detectives to be a federal fugitive was seen in bed in apartment PH–L about a week earlier.

That same day the detectives received information from Fulton, a member of the Bay Club maintenance staff, that the federal fugitive was seen in apartment 9–L about ten days earlier.

Armed with this information, sometime in early January, 1985 Healy advised DEA Task Force 3 agents that Rodriguez may be located at the Bay Club.

Giovino, together with other members of the Task Force, arrived at the Bay Club on January 9, 1985 "to ascertain whether or not we were going to try and enter a third party location." (Tr. 57).

The agents surveilled PH–L on January 9, 1985 and reached the conclusion that lights were going on and off. Giovino, according to testimony not credited by this

court, exhibited photographs of Rodriguez to the same people who positively identified photographs shown by Healy and Pena.

Additionally, agent Giovino testified that he showed photographs of Rodriguez to Bosio, the chief of security at the Bay Club, on January 9. Bosio denied being shown photographs by Giovino and stated that at no time did he positively identify the photographs.

On January 10, 1985 the agents were aware that certain repair work was to be done in PH–L. Giovino approached Wambser and asked Wambser if he would mind if Giovino accompanied him to PH–L.

■ Giovino was admitted to the apartment, as a maintenance man, by defendant Ospina. As the tenant of the apartment who was present at the time of the entry and search (for Rodriguez, among other things), Ospina clearly had a legitimate expectation of privacy therein and has standing. Moreover, the government does not contest the standing of defendant Zuluaga either. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The ostensible purpose of the agent's entry into PH–L was to execute the outstanding arrest warrant for Rodriguez. Yet, Giovino's, as well as the other agent's, testimony demonstrates that the agents really did not know if Rodriguez either lived in PH–L or was present in PH–L.

■ It is axiomatic that if Ospina's reasonable expectation of privacy must yield to the right of the agent to execute an arrest warrant, the decision to invade that privacy must be made by a judicial officer, not by a policeman or a government enforcement agent. *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1947).

■ The value of the Fourth Amendment is such that police should not be encouraged "to adopt a let's-wait-until-its-decided approach." *United States v. Johnson,* 457 U.S. 537, 561, 102 S.Ct. 2579, 2593, 73 L.Ed.2d 202 (1982) *citing Desist v. United States,* 394 U.S. 244, 277, 89 S.Ct. 1030, 1052, 22 L.Ed.2d 248 (1969) (Fortas, J.,

dissenting). Accordingly, if the purpose of the exclusionary rule is to deter unlawful police conduct then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment. *United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975); *Illinois v. Gates,* 462 U.S. 213, 261, fn. 15, 103 S.Ct. 2317, 2344, fn. 15, 76 L.Ed.2d 527 (1983) (White, J., concurring). *See also United States v. Impink,* 728 F.2d 1228 (9th Cir.1984) (courts disfavor contention that probable cause existed when the case is marginal and the police had an ample opportunity to obtain a warrant in advance).

Absent consent or exigent circumstances, neither of which are present here, *Steagald v. United States,* 451 U.S. 201, 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), holds that the police may not enter the home of a third party to execute an arrest warrant. The agents must obtain a search warrant that covers the home. *Id.* at 216, 101 S.Ct. at 1649.

The entry and search in this case is exactly the abuse the *Steagald* court sought to curb. As the court recognized, "an arrest warrant may serve as a pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place. *Id.* at 215, 101 S.Ct. at 1649 (*citing Chimel v. California,* 395 U.S. 752, 767, 89 S.Ct. 2034, 2042, 23 L.Ed.2d 685 (1969); *see United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932)).

Instead of obtaining a warrant to enter PH–L, as is required by the mandate of *Steagald, supra,* the agents disingenuously testified that the statements of Wambser and Fulton constituted probable cause to believe a) that Rodriguez resided in PH–L, and b) that Rodriguez would be present in PH–L.

At the outset of the hearing, the government stated that it would prove that there

was such probable cause by a preponderance of the evidence. It cannot be said that the testimony of the government's witnesses, replete with recantation, retestimony and repudiation proved anything by a preponderance of the evidence.

The testimony of the agents is especially tenuous in that their attempt to corroborate the identification made by Wambser and Fulton consisted solely of an effort to ascertain whether or not lights could be seen going on and off in PH–L.

■ Therefore, the entry by agent Giovino, posing as a maintenance worker, into PH–L, *solely for the purpose of determining whether or not Rodriguez was present,* violates the Fourth Amendment to the United States Constitution.

The facts of surrounding the initial entry herein are remarkably similar to the facts in *Steagald, supra.*

In *Steagald,* a confidential informant notified a DEA agent that he might be able to locate a federal fugitive. A week or so later the same informant gave the agent a telephone number where the fugitive could be reached during the next 24 hours. The agent notified fellow DEA agents who secured the address corresponding to the telephone number.

Two days later, a group of DEA agents went to the address. The agents approached two men, standing in front of the house, demanded identification, and determined the men were not the fugitive. Other agents proceeded to the house whereupon a woman answered the door, stated she was alone, and the agents nevertheless went in the house and searched for the fugitive. The fugitive was not present. Present, however, was what the agents believed to be cocaine.

After discovering the cocaine an agent was dispatched to obtain a search warrant. In the meantime, a second search uncovered additional incriminating evidence. A warrant was ultimately obtained and the agents uncovered 43 pounds of cocaine.

The agent in *Steagald* believed that the arrest warrant for the fugitive was sufficient to justify the entry and the search.

The Supreme Court held that a law enforcement officer may not legally search for the subject of an arrest warrant in the home of a third party, absent exigent circumstances or consent, without a search warrant. *Steagald,* 451 U.S. at 205, 101 S.Ct. at 1644.

There is some authority for the proposition that had Rodriguez been found in PH–L that Rodriguez would not have a reasonable expectation of privacy in PH–L whether it was his home or not. *United States v. Underwood,* 717 F.2d 482 (9th Cir.1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984).

■ However, Ospina and Zuluaga are not Rodriguez. Nor was Rodriguez present in their home at the time Agent Giovino, by virtue of false pretenses, gained entry into PH–L. Furthermore, the court holds that there was no reasonable expectation that Rodriguez would be present in PH–L at the time of the entry. Therefore, the rule of law is clear vis-a-vis Ospina and Zuluaga, who *did* reside in PH–L, and who were present, that "[t]he right of a third party *not* named in the arrest warrant to the privacy of his home may not be invaded without a search warrant," *Id.* at 484, *citing Steagald v. United States, supra* (emphasis in original).

Defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated.

*United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

The most insurmountable of the agents' Fourth Amendment difficulties is presented by *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) in that the agents had no reason to believe that Rodriguez would be present in PH–L on January 10, 1985.

■ This court holds that a warrant, such as that possessed by DEA Task Force

3, which may, under certain circumstances, authorize entry into a dwelling for the purpose of arresting a fugitive, does not authorize the agent to enter dwellings where the fugitive is not reasonably likely to be. *United States v. Spencer,* 684 F.2d 220 (2d Cir.1982).

The cases cited by the government in support of an entry by ruse do not overcome the presumption by this court that the entry by Giovino into PH–L is *per se* unreasonable.

In *United States v. Raines,* 536 F.2d 796 (8th Cir.1976), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976), an undercover agent purchased heroin from one Pierce and Pierce was immediately arrested. Pierce identified his source to be one Longville, who was also arrested. Longville identified his source to be Raines. The agent then proceeded to Raines' home, knocked on Raines' door, and identified himself as a friend of Longville. The agent asked Raines if he knew Longville and Raines replied affirmatively. The connection between Longville and Raines having been established, the agent informed Raines that Longville had been arrested. Raines was visibly unnerved, yet he invited the agent into his home for further voluntary discussions.

The case can be distinguished on two grounds. First, the court in *Raines, supra,* held that, "The officers' acquiescence thereafter in defendant's spontaneous surrender of inculpatory evidence was not a search or seizure and the defendant's voluntary admissions were not coerced." *Id.* at 799.

Here, Ospina was never offered the opportunity to consent to the agents entry nor did he make any statements connecting himself to Rodriguez or to drugs. Moreover, there is no claim that Ospina was asked whether he knew Rodriguez. In fact, during cross-examination, Ospina denied knowing Rodriguez.

Second, in *Raines, supra,* the court in a footnote at 799 noted that the defendant could not contend that the agent "lacked an articulable and objective basis for reasonable suspicion that criminal conduct was afoot in the defendant's home, leading him to investigate further by going there." *Id.*

At best, the agents had a mere suspicion that Rodriguez was, in the past, present at PH–L. They had no reasonable grounds whatsoever to believe that Rodriguez *lived* in PH–L.

Moreover, given the one-month delay between the last known sighting of Rodriguez, the total lack of corroboration of these sightings, and the obvious transient connection between Rodriguez and PH–L, there is no justification for the view that a mere connection with an accused *ipso facto* denotes the presence of ongoing criminal conduct.

■ In short, the record amply satisfies this court that the entries into PH–L were merely a pretext for the purpose of conducting a general exploratory search for evidentiary materials tending to connect Rodriguez to PH–L. In fact, it was Giovino's testimony that he wanted to "just see" if Rodriguez was present at PH–L (Tr. 16). It was Connors' testimony that the agents had essentially been frustrated in their search for Rodriguez and escorting Ospina to PH–L and having him open the door for the agents was "the only way to do it." (Tr. 180).

*See, e.g., United States v. Foster,* 711 F.2d 871, 878 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984), *citing United States v. Valenzuela,* 596 F.2d 824, 828 (9th Cir.1979), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979), (justification for a search of a residence must be based upon probable cause to believe the evidence sought is presently in the place to be searched).

*United States v. Syler,* 430 F.2d 68, 70 (7th Cir.1970) is equally unavailing. In *Syler, supra,* a gasoline station attendant stated to a Secret Service agent that he received a counterfeit $20 bill "from a woman riding in the back seat of a 1965 Maroon Pontiac automobile." *Id.* at 69.

The agent's affidavit recited that he had personally investigated and observed the attendant and determined that Syler was the woman. The observation and identification all took place within twenty-four hours. A warrant for the arrest of Syler was issued.

The agent proceeded to the address of Syler's codefendant where an automobile registered to Syler was located. Accordingly, the likelihood of Syler's presence was confirmed.

Claiming to be the "gas man," an agent entered the residence, thereupon announced his true purpose, and arrested the defendant. A search of defendant's purse revealed the counterfeit bills.

*Syler, supra,* is distinguishable on several grounds.

First, the agents in *Syler* verified that the automobile of the defendant was present at the location sought to be entered. Conversely, the agents surveilling the Bay Club garage did not even write down the license plate number of the vehicles after "many hours" of observation.

Second, the court does not believe that Giovino showed photographs to Fulton and Bosio for the purpose of reiterating what they [Fulton and Bosio] supposedly told Healy and Pena. In any event, showing the photographs to Fulton and Bosio would not corroborate their own (non-existent) prior statements. Therefore, the element of corroboration vis-a-vis the informants identification is wholly lacking.

*United States v. Salgado,* 347 F.2d 216, 217 (2d Cir.1965), *cert. denied,* 382 U.S. 870, 86 S.Ct. 146, 15 L.Ed.2d 108 (1965) is a case where agents, armed with information that heroin was for sale, went to an address and advised the occupants that they had "business" to do with the defendant. The agents were invited in. Moreover, the informant who provided the information had done so on forty-five or fifty prior occasions.

The Second Circuit held that this record of past reliability alone would warrant accepting the information as credible. Cer-

tainly, there can be no claim that Wambser, who had never previously identified a police photograph, can be said to be so reliable that his observation of an individual nearly one month prior to the entry, constituted probable cause to believe Rodriguez was present in PH–L.

*Leahy v. United States,* 272 F.2d 487, 490 (9th Cir.1959), *cert. dismissed,* 364 U.S. 945, 81 S.Ct. 465, 5 L.Ed.2d 459 (1961) held that there is no constitutional mandate forbidding the use of deception in executing a valid arrest warrant. *Id.* at 490.

Of course, in *Leahy,* the home sought to be entered was the home of the subject of an arrest warrant. Moreover, the record in *Leahy* contained nothing to indicate that the arrest was "merely a pretext for the purpose of conducting a general exploratory search for merely evidentiary materials tending to connect the accused with some crime." *Id.* at 491. Such a pretext clearly exists in the matter at bar.

There is no doubt, to this court, that had a neutral and detached magistrate decided that PH–L was Rodriguez' home, the entry would have been legal.

■ What is illegal are uncorroborated and isolated observations which lead a police officer to believe that a particular place is a man's home. Essentially, police officer Healy determined that PH–L was Rodriguez' home and he communicated this determination to agent Giovino.

■ Hearsay information, such as that provided by Healy, can suffice to establish probable cause. *Jones v. United States,* 362 U.S. 257, 269–70, 80 S.Ct. 725, 735–36, 4 L.Ed.2d 697 (1960), provided there is a "substantial basis for crediting the hearsay." *United States v. Harris,* 403 U.S. 573, 581, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971) (plurality opinion).

■ Accordingly, this court has evaluated the identification of the photographs by Wambser and Fulton and the non-identification thereof by Bosio in accordance with *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) to deter-

mine if there was probable cause to believe that PH–L was Rodriguez' home and whether it was reasonably likely for Rodriguez to be present at PH–L on January 10, 1985. The court concludes there was no such probable cause for either proposition. *See, e.g., United States v. Zucco,* 694 F.2d 44 (2d Cir.1982)

This court is convinced that the information is no more reliable than a casual rumor. *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The complete lack of corroboration of the information supplied by Wambser does nothing to buttress the reliability of his identification in that the agents had no information confirming the accuracy of the tip. Under the circumstances, it was unreasonable for Giovino to pose as a maintenance man and enter PH–L to merely see if a fugitive was present.

The rule is relatively clear that a one-month old sighting of Rodriguez in PH–L, on one occasion, could be seen to describe no more than an isolated event in the past. Moreover, the visual surveillance of PH–L and the parking spaces in the garage was not designed to, and did not, yield anything of any probative value. *United States v. Weinrich,* 586 F.2d 481, 491 (5th Cir.1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979). *Accord, United States v. Haimowitz,* 706 F.2d 1549 (11th Cir. 1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984).

Thus, in cases where an entry has been upheld on the basis of probable cause, there was direct evidence that the suspect lived at a particular address with a relative degree of continuity; the evidence was substantially confirmed, and moreover, the evidence was "fresh;" these elements are wholly lacking here. *See United States v. Spencer,* 684 F.2d 220 (2d Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983); *United States v. Levy,* 731 F.2d 997 (2d Cir.1984); *United States v. Landis,* 726 F.2d 540 (9th Cir.1984), *cert. denied,* —— U.S. ——, 104 S.Ct. 2688, 81 L.Ed.2d 882 (1984); *United States v. Campbell,* 732 F.2d 1017 (1st Cir.1984).

The conclusion is inescapable that the agents were remiss in their duty to ascertain the presence of Rodriguez prior to entering PH–L by ruse. The agents' choices, based upon the information they possessed were:

1) to present their information to a neutral and detached magistrate, or

2) continue investigating.

Instead, the agents by false pretenses entered PH–L. After learning that Rodriguez was not present in PH–L, the agents proceeded to arrest Ospina without probable cause to do so.

### B. *The Arrest of Juan Carlos Ospina*

The agents' testimony indicates that two automobiles, located in parking spots assigned to PH–L, were surveilled in the Bay Club garage on January 10, 1985. The agents' testimony is that no effort was made to ascertain the ownership of the automobiles by way of a license plate check. Moreover, Giovino advised his fellow agents that Ospina was the last person present in PH–L.

Thus, when Ospina appeared in the garage at about 3:00 p.m. the agents decided to "stop" Ospina and obtain an identification from him.

Platzer and Dolinsky blocked Ospina's Toyota Celica with a government vehicle and approached Ospina, who was sitting in the driver's seat. Platzer had his gun drawn. Ospina was ordered to exit the Toyota, which he did.

One agent removed Ospina's license and registration. The license and registration were not returned to Ospina; instead, they were given to the supervisor.

Ospina's telephone beeper was seized. The keys to the Toyota were removed from the vehicle and utilized to open its trunk. The automobile was thoroughly searched.

There were at least seven officers present in the garage in Ospina's immediate vicinity. The agents were dissatisfied with the address appearing on the license and registration. The agents wanted

"proof" that Ospina, indeed, resided at the Bay Club. When Ospina remarked that he had "proof" in PH–L, one agent said, "Let's go." The agents, with the exception of Connors, testified that the above was not an arrest, but that it was "consent" to enter and search PH–L.

The question was thus presented in *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), "whether the officers action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

The agents had received an opinion from an Assistant U.S. Attorney that it would be acceptable to stop Ospina for the purpose of obtaining identification from him. The government argues in support of the stop that there were articulable facts supporting a reasonable suspicion that Ospina was committing a criminal offense. Accordingly, the government contends that Ospina was correctly stopped for the purpose of identifying himself, to have him "voluntarily" answer questions, and to obtain additional information from him. *United States v. Hensley*, — U.S. —, 105 S.Ct. 675, 83 L.Ed.2d 604 (D.C., 1985); *cf. United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

▮ Of course, neither reasonable suspicion nor probable cause would suffice to permit the officers to transport Ospina from the garage to his home to enable a warrantless entry into the home based upon mere dissatisfaction with the information contained in Ospina's license and registration. *Hayes v. Florida*, — U.S. —, 105 S.Ct. 1643, 84 L.Ed.2d 705 (D.C., 1985).

▮ The stop of Ospina was not a mere "investigatory stop," *Terry v. Ohio, supra*, but was the "functional equivalent" of an arrest, and therefore required probable cause. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Marin*, 669 F.2d 73, 81 (2d Cir.1982).

▮ The difference between a stop and an arrest lies in the degree of force used; and it is the objective circumstances surrounding the stop, not the police officer's subjective intent, that determines whether an arrest has taken place. *United States v. Levy*, 731 F.2d 997 (2d Cir.1984); *United States v. Ceballos*, 654 F.2d 177, 182 n. 8 (2d Cir.1981).

▮ The factors determining whether an arrest has occurred include the amount of force used, the extent of the intrusion, and the degree of restraint on the individual's freedom of movement. *United States v. Marin, supra*, at 81; *United States v. Ceballos, supra*. When the stop involves cars, *Marin* requires the court also consider the number of police officers and cars used to make the stop, whether the car was blocked and whether the police had their guns drawn and in view. *United States v. Marin, supra*, at 81.

Accordingly, the court has considered the following in reaching its conclusion that Ospina was arrested in the garage:

1. The Toyota was "blocked";

2. An agent's gun was drawn and in view;

3. There were at least seven agents present;

4. The interior as well as the trunk of the Toyota was searched;

5. The Toyota's keys were taken by the agents;

6. The detention in the garage was for at least twenty minutes;

7. The agents took Ospina's license and registration away from him;

8. Ospina's telephone beeper was seized;

9. Ospina was never told that he was free to leave; and in fact, Ospina was not free to leave.

▮ The restraint placed on Ospina was clearly "tantamount to an arrest." Probable cause, therefore, was required to

justify the stop. *United States v. Marin, supra.* Probable cause to arrest exists when the facts and circumstances within an agent's knowledge, or of which he has reasonably trustworthy information, would warrant a man of ordinary caution to believe that the arrestee has committed or is committing a crime. *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963). *See also United States v. Cordell,* 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (seizure occurs when officer hands driver's license and airlines ticket to second officer and tells suspect a narcotics investigation is on); *United States v. Burgos,* 720 F.2d 1520, 1524 (11th Cir.1983) (arrest occurs when suspect believes that he is no longer free to leave); *United States v. Thompson,* 712 F.2d 1356 (11th Cir.1983) (arrest occurs when agent retains driver's license); *United States v. Waksal,* 709 F.2d 653, 660 (11th Cir.1983) (arrest occurs when agents ask individual to accompany them to airport office, retain suspect's identification, and suspect is not informed of his right to refuse to answer or to consent to search).

■ Connors maintained that at the time he ordered Ospina stopped he had "no idea" who Ospina was. Furthermore, Connors' fellow agents apparently did not believe Ospina's claim that he lived in PH–L. The confusion, of course, is manifest by the fortuitous non-presence in the garage of Giovino, who was the only agent capable of connecting Ospina with PH–L. Certainly, if the agents did not know who they were detaining, there is no legitimate reason to detain that person for any period of time. There is even less reason to embark on a "fishing expedition" of the sort engaged in here.

It is thus apparent to this court, in contrast to the agents' testimony, that the agents did not believe PH–L to be Rodriguez' home. If the government's argument is correct, that PH–L was Rodriguez' home, the agents would be entitled to detain *any* individual whose presence can be connected to the home of a fugitive. *Cf.*

*Ybarra v. Illinois,* 444 U.S. 85, 90, 100 S.Ct. 338, 341, 62 L.Ed.2d 238 (1979). The argument is simply not correct.

■ Moreover, the illegal entry into what is Ospina's, but not Rodriguez', home, and the observations made therein, is violative of Ospina's right to privacy. *Steagald v. United States, supra.* It thus follows that such observations cannot be worthy of establishing probable cause.

■ Accordingly, if at the time Ospina was arrested, the agents knew nothing about him, had never seen or heard of him, and had no information about him, there was no reason to believe he had committed or was committing a crime.

■ Moreover, the illegally surreptitious observation of three steamer trunks, a safe and two notebooks in a closet in Ospina's home does not establish probable cause to arrest. There are no attenuating circumstances herein sufficient to dissipate the taint of the illegal entries and the arrest. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

The conclusion is inescapable that Ospina was illegally arrested.

## C. The "Consent" Search of PH–L

There is a substantial conflict in the agents' testimony concerning where and when Ospina gave "consent" to the search of PH–L. Giovino, for instance, said the invitation to search was given in the Bay Club garage. (Tr. 36). Connors testified that it was he who sought Ospina's consent and that he did not ask Ospina for consent until the agents were already in the apartment. (Tr. 164–165).

It is clear, however, that after the agents had already been in the apartment conducting a "sweep" search Ospina was formally asked for consent to search which was, not surprisingly, refused. Moreover, at the time consent was sought Ospina had been in custody, that is, under arrest, for nearly half an hour.

The facts reveal that after the agents had searched Ospina's person, the contents

of his wallet, the interior and trunk of his automobile, and had examined his license and registration, the agents were reasonably certain that Ospina was not carrying contraband of any kind.

The agents' testimony is that Ospina volunteered to go upstairs to PH–L so that he could provide the agents with "proof" that he lived in PH–L. The necessity for Ospina to proffer such proof is unclear. What is clear, however, is that the agents coerced Ospina into returning to PH–L so that they could accompany him therein.

■ If Ospina had failed to provide identification to the officers, there would, nevertheless, be no probable cause to arrest him. *Florida v. Royer, supra,* 460 U.S. at 497–98, 103 S.Ct. at 1323–24 (plurality opinion). Moreover, the alleged consent to search given by Ospina would be equally invalid under these circumstances. *Id.* at 497, 103 S.Ct. at 1323.

The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony that the purpose of their action was 'for investigation' or for 'questioning.' ... The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright and confusion.

*Brown v. Illinois, supra,* 422 U.S. at 605, 95 S.Ct. at 2262 (1975).

■ Most importantly, it is well established that the arrest of Ospina does not justify the removal of Ospina from the Bay Club garage for the purpose of enabling the agents to enter the apartment with Ospina. *See Hayes v. Florida, supra; Welsh v. Wisconsin,* 466 U.S. 740, ——, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *Florida v. Royer, supra; Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979); *United States*

*v. Agapito,* 620 F.2d 324 (2d Cir.1980), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980); *see also, Segura v. United States,* —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

In *Agapito, supra,* the defendant was arrested in a hotel lobby and transported to his hotel room to enable the arresting agents to conduct a warrantless "security check" thereof. The Second Circuit in holding the entry illegal found that there was no reason to believe that accomplices of the defendant knew of the arrest so that they could destroy evidence or harm the agents.

The *Agapito, supra,* court at 336 fn. 18 enunciated the standard to be applied:

... the arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public.

Clearly, the agents were aware that PH–L was empty. The emptiness of PH–L is the reason given to justify the stop of Ospina. The impropriety of the agents' action is obvious.

Moreover, this court has determined that Ospina's "consent" to search was never given. Connors testified that he purposefully avoided advising Ospina of his right to refuse consent until after the agents had already gained entry to PH–L.

■ Accordingly, it is the opinion of this court that Ospina did not freely and voluntarily give his consent to the officers' entry into PH–L, but rather he succumbed to a claim of lawful authority. Here, as in *United States v. Vasquez,* 638 F.2d 507 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981), the entry was presented to the occupant of the apartment as a *fait accompli. Id.* at 526–27. In this situation, whatever consent that may have been given was not given voluntarily. *See Johnson v. United States,* 333

U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948).

### D. The Arrest of Zuluaga

The agents, after having executed the search warrant, transported Ospina to the Metropolitan Correction Center. Some agents, however, remained in PH–L, ostensibly to arrest Rodriguez "or anyone else" who entered PH–L.

■■■■ In that this court has held the prior entries of the agents into PH–L to be illegal, there is no reason to believe that the agents remaining in PH–L after the execution of the search warrant is justified. Moreover, there is no "continuing the investigation" exception to the warrant requirement. *United States v. Agapito, supra.*

■■ The fact that Zuluaga entered the apartment sometime after 11:00 p.m. is not indicative of criminal conduct. Furthermore, the notebook seized from Zuluaga which formed the basis of the officer's belief that Zuluaga was a drug dealer was so tiny that it is unreasonable to believe that the notebook seized was the product of a pat-down search.

Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places. *See Rakas v. Illinois,* 439 U.S. 128, 138–43, 148–49 [99 S.Ct. 421, 427–30, 432–33, 58 L.Ed.2d 387 (1978)]; *Katz v. United States,* 389 U.S. 347, 351–52 [88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967)].

*Ybarra v. Illinois, supra,* 444 U.S. at 91, 100 S.Ct. at 342.

■■ There is no dispute that PH–L is Zuluaga's home. Accordingly, the agents' presence there contravenes Zuluaga's legitimate expectations of privacy.

Zuluaga was illegally arrested.

### E. The Search Warrant

The government argues that the evidence seized in PH–L, with the exception of the notebooks and a small quantity of cocaine on the windowsill, was found pursuant to a valid search warrant.

The defendant argues that each of the four entries into PH–L were illegal and that there is no residuum of untainted evidence which could lead a neutral and detached Magistrate to make a finding of probable cause. Furthermore, defendant argues that the agents exhibited a reckless disregard for the truth in the warrant affidavit and, in fact, misled the magistrate.

■■ This court agrees that each of the four entries into PH–L was illegal. The first three entries were illegal due to the lack of probable cause to believe Rodriguez resided and/or was present in PH–L. *Steagald v. United States, supra.* The fourth entry was part and parcel of the illegal arrest of Ospina.

The information the agents derived from these entries must be stricken from the warrant affidavit. *United States v. Segura, supra,* 104 S.Ct. at 3386.

■■ With respect to the claim that there are materially misleading statements which were made with reckless disregard for the truth, if this be true, then those statements must be excised as well. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978).

Accordingly, the court analyzes the warrant affidavit as follows:

Dolinsky advised the magistrate that the source of his information was based primarily on conversations with Giovino. Dolinsky did not advise the magistrate that Giovino received much of his information from Healy. In turn, Healy received his information from Fulton and Wambser. In

other words, the magistrate was unaware that the information was triple hearsay.

Dolinsky stated that security personnel had positively identified Rodriguez as residing in PH–L for about three months. This statement is false. Security personnel (Fulton) had seen Rodriguez on one occasion in 9–L one month prior to the application. Maintenance personnel (Wambser) had seen Rodriguez in bed on one occasion about one month previously. Neither Fulton nor Wambser knew Rodriguez by *any* name nor did they state that Rodriguez "lived" in PH–L for the past three months.

The magistrate was never advised that surveillance of PH–L was unavailing. Therefore, the magistrate did not know that the agents could not and did not corroborate what little information that they had.

The magistrate was advised that Ospina consented to a search of PH–L. This statement is also false. Consent to search PH–L was only sought after Ospina was under arrest (another fact not disclosed to the magistrate) and after the search had already begun. Moreover, the consent was never given.

Most seriously, the magistrate was never told that the agents "had been doing their homework" on Juan Carlos Ospina. Therefore, the conspicuous misidentification of Ospina in the warrant application is not understandable.

██ Had there been just one misstatement, this court might be able to conclude that it was made negligently. In this case, however, the court finds that several false statements were essential to a finding of probable cause, and were made, at the very least with reckless disregard for the truth. *See United States v. Bowe,* 698 F.2d 560, 564–65 (2d Cir.1983); *cf. United States v. Leon,* — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

██ The statements based upon observations made during the illegal entries, and those that this court has determined to be made in reckless disregard for the truth, must be disregarded in the determination

whether probable cause existed for the issuance of the warrant. This court holds, without these statements, the affidavit did not provide the magistrate with probable cause to issue the search warrant. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Bowe, supra; see United States v. Taborda,* 635 F.2d 131, 140 (2d Cir.1980).

## CONCLUSION

For all of the foregoing reasons, that is, the totality of the circumstances, the defendants' motion is granted. The evidence seized pursuant to the illegal searches is suppressed. The evidence seized pursuant to the search warrant is suppressed. The search warrant is quashed.

So ordered.

## ON MOTION TO RECONSIDER

The United States Attorney moves this court to reconsider the Memorandum of Decision and Order made by this court on July 2, 1985. For the reasons that follow, the motion is denied.

It is the government's position that regardless of Giovino's purpose in entering PH–L, the entry was lawful. The Government's Memorandum to Reconsider at 3 states:

> Agent Giovino did not need a warrant to enter the apartment, even if his avowed purpose was to execute an arrest warrant for Rodriguez-Orjuelo, because he had the consent of the residents.

It is undisputed that the consent, if any, was based upon Giovino's pretense as a maintenance worker, and that accordingly, it was not knowingly and intelligently made.

It is apparent to this court that the government is arguing in support of the proposition that government agents may enter a premises for *any* reason, provided that they do so under the (false) pretense that the agent is not acting as an agent. For this court to so hold would relegate the Fourth Amendment to memory and eliminate it in practice.

It is axiomatic that execution of arrest warrants are subject to the limitations contained in 18 U.S.C. § 3109. The Government does not even attempt to justify the execution of the arrest warrant as being in satisfaction of the statute. Moreover, it is clear without any doubt that there were neither "exigent circumstances" nor "hot pursuit" in order to satisfy the limited exceptions to 18 U.S.C. § 3109.

Additionally, the government argues that there is "no proof" that Giovino exceeded the scope of the so-called invitation. In fact, this court has determined that Giovino seized an envelope bearing the name of the Toyota dealer during one of the "consensual" entries.

Although Giovino testified that he limited his activities, this court simply does not believe the testimony inasmuch as it was rife with contradiction on this very point.

The government next argues that this court should consider the footlockers and steamer trunks as elements of probable cause. Initially, the court notes that nearly every person in the United States who lives at a particular place for a limited period of time, e.g., students, could be linked with Rodriguez on the basis of this observation. Moreover, this court has held the entry to be illegal *ab initio*. Accordingly, none of Giovino's observations were legally made.

At page 6 of its Memorandum in Support, the government argues "that only three weeks before Giovino made his observations ... Wambser had positively identified Rodriguez...." The court notes that Wambser's observation of Rodriguez was *at least* thirty days, not three weeks, old. Additionally, the government's reliance on *any* of Fulton's statements regarding PH–L or the penthouse floor is entirely misplaced. This court does not believe *anything* that Fulton said regarding the penthouse floor inasmuch as Fulton's testimony is so inconsistent on this point that it is wholly unworthy of belief.

The government characterizes PH–L as a "recent residence" of Rodriguez. There is no support in the record whatsoever for this proposition. In fact, this court ex-

pressed great dismay at the absolute failure of the Task Force to ascertain if either PH–L was Rodriguez' residence or whether Rodriguez would be present in PH–L on the date Giovino sought entry therein.

What the government would have this court do is determine that Rodriguez' transient presence in PH–L on *one* occasion constitutes residence. This court will not accomplish for the government what its agents' sloppy work failed to uncover. Essentially, the government has consistently argued, without expressing it directly, that this court adopt the dissent in *Steagald v. United States*, 451 U.S. 204, 223, 101 S.Ct. 1642, 1653, 68 L.Ed.2d 38 (1980).

> If a suspect has been living in a particular dwelling for any significant period, say a few days, it can certainly be considered his "home" for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if the suspect concurrently maintains a residence elsewhere as well. In such a case the police could enter the premises with only an arrest warrant. On the other side, the more fleeting a suspect's connection with the premises, such as when he is a mere visitor, the more likely that exigent circumstances will exist justifying immediate police action without departing to obtain a search warrant.

*Steagald* at 230–31, 101 S.Ct. at 1656–57, (Rehnquist, J. dissenting).

 Rodriguez was in PH–L on one day, not several days. Moreover, the sighting of Rodriguez was at least thirty days old. Healy waited two weeks before he advised the Task Force of the sighting. The facts belie immediacy. There are no exigencies. The Fourth Amendment *ipso facto* prohibits "fishing expeditions" by agents posing as maintenance workers. There is no reason to reconsider the order granting the motion to suppress

So ordered.